1  Alicia J. Donahue (SBN 117412)
      adonahue@shb.com
2  Gabrielle Handler Marks (SBN 203733)
      gmarks@shb.com
3  SHOOK, HARDY & BACON L.L.P.
   333 Bush Street, Suite 600
4  San Francisco, California 94104-2828
   Telephone:    415.544.1900
5  Facsimile:    415.391.0281

6  Attorneys for Defendant
7  WAL-MART REAL ESTATE BUSINESS TRUST

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  SAVE MART SUPERMARKETS, d/b/a FOOD )  Case No. _____
    MAXX, a California Corporation,       )
12                                        )
                                          )  NOTICE OF REMOVAL OF WAL-MART
13            Plaintiff,                  )  REAL ESTATE BUSINESS TRUST UNDER
                                          )  28 U.S.C. §§ 1441, 1446 AND 1332
14     vs.                                )  (DIVERSITY)
                                          )
15  WAL-MART REAL ESTATE BUSINESS         )
    TRUST, a Delaware Statutory Trust,    )
16                                        )  Complaint filed: July 15, 2008
              Defendant.                  )
17                                        )
                                          )
18                                        )
                                          )
19                                        )
                                          )
20                                        )

21

22

23

24

25

26

27

28

143262V2

1    Pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446, Defendant WAL-MART REAL

2    ESTATE BUSINESS TRUST files this Notice of Removal of this case from the California Superior

3    Court for the County of Sonoma to the United States District Court for the Northern District of

4    California. In support of this Notice of Removal, Wal-Mart states the following:

5                                    **REMOVAL PROCEDURES**

6        1.    On July 15, 2008, an action entitled *SAVE MART SUPERMARKETS, d/b/a FOOD*

7    *MAXX, a California Corporation, Plaintiffs, vs. WAL-MART REAL ESTATE BUSINESS TRUST, a*

8    *Delaware Statutory Trust, Defendant*, was filed in the Superior Court for the State of California in

9    and for the County of Sonoma, Case No. SVC-243210.

10       2.    Wal-Mart Real Estate Business Trust ("Wal-Mart") received a copy of the complaint

11   and summons on July 18, 2008.

12       3.    Under 28 U.S.C. §1446(b), the notice of removal of a civil action shall be filed within

13   30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial

14   pleading setting forth the claim for relief upon which such action or proceeding is based. To trigger

15   the 30-day removal period, the defendant must receive the summons and complaint by proper

16   service. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999). Thus,

17   this removal is timely.

18       4.    A copy of all process, pleadings, and orders provided to Wal-Mart in this action is

19   attached as Exhibit A. *See* 28 U.S.C. § 1446(a). There have been no proceedings in this action in

20   the Sonoma County Superior Court involving Wal-Mart, nor has Defendant filed responsive

21   pleadings or otherwise responded to Plaintiff's complaint. Wal-Mart reserves any and all rights to

22   assert any and all defenses to Plaintiff's complaint.

23       5.    Venue is proper pursuant to 28 U.S.C. § 1391 because this action was pending in

24   Sonoma County Superior Court.

25                                 **DIVERSITY JURISDICTION EXISTS**

26       6.    This Court has original jurisdiction over this lawsuit under 28 U.S.C. § 1332 and this

27   diversity action may be removed to this Court under 28 U.S.C. §§ 1441 and 1446. Suits that do not

28                                          2                    NOTICE OF REMOVAL

143262V2

1   arise under federal law are removable "if none of the parties in interest properly joined and served as

2   defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). The

3   amount in controversy exceeds $75,000. *Id.* § 1332(a).

4          7.     Plaintiff Save Mart Supermarkets, d/b/a Food Maxx ("Save Mart") is a California

5   Corporation.[1]

6          8.     Wal-Mart Real Estate Business Trust is a wholly-owned subsidiary of Wal-Mart

7   Property Co. It is a Delaware Trust with its principal place of business in Bentonville, Arkansas.

8                                    **AMOUNT IN CONTROVERSY**

9          9.     The amount in controversy in this case exceeds $75,000, excluding interest and costs.

10  A defendant can establish the amount in controversy by the allegations in a complaint, or by setting

11  forth facts in the notice of removal that demonstrate that the amount in controversy exceeds $75,000.

12  *Green v. Party City Corp.*, No. CV-01-09681, 2002 WL 553219, at *2 (C.D. Cal. 2002) (noting that

13  if the complaint is silent on the amount of damages claimed, the court may consider facts in the

14  removed petition); *Gaus v. Miles, Inc.*, 980 F.2d 564, 576 (9th Cir. 1992).

15         10.    Plaintiff seeks declaratory and injunctive relief against Wal-Mart, seeking to enjoin

16  Wal-Mart from operating "a retail food store of any nature or a retail grocery food store in the

17  Center." Plaintiff's Complaint, ¶¶ 33. Plaintiff's complaint does not specify a damages amount.

18  Where a plaintiff seeks equitable relief, the amount in controversy is satisfied where either plaintiff

19  or defendant could lose the jurisdictional amount. *In re Ford Motor Co./Citibank et al.*, 264 F.3d

20  952, 958 (9th Cir. 2001).

21         11.    Plaintiff alleges that "unless enjoined and restrained by order of this Court, Wal-

22  Mart's operation of a retail food store of any nature or a retail grocery food store at the Center will

23  cause great and irreparable injury to Save Mart by diminishing the value, usefulness and economic

24  value of its Food Maxx Store . . .." *Id.*, 34, 37, 42, 47. In fact, Save Mart has stated that "the cost to

25  Save Mart from having Wal-Mart competing with it at the Center will be, at a minimum, $89,000 in

26

27  ---
    [1] Plaintiff's Complaint ("Compl.") at ¶¶ 1.

28                                          3                        NOTICE OF REMOVAL

1   sales per week."[2] Thus, the amount in controversy meets the jurisdictional requirement.

2                                    **CONCLUSION**

3        12.     Pursuant to 28 U.S.C. § 1446 (d), a copy of this Notice of Removal is being filed with

4   the clerk of the Superior Court of California, County of Sonoma.

5        13.     Pursuant to 28 U.S.C. § 1446 (d), Wal-Mart is providing written notice to Plaintiff.

6        WHEREFORE, Wal-Mart Real Estate Business Trust hereby removes the action now

7   pending against it in the Superior Court of the State of California, County of Sonoma, to this

8   Honorable Court, and requests that this Court retain jurisdiction for all further proceedings.

9

10  DATED: August 14, 2008                      Respectfully submitted,

11                                              SHOOK, HARDY & BACON L.L.P.

12
                                                By: _____
13                                                  ALICIA J. DONAHUE
                                                    GABRIELLE HANDLER MARKS
14

15                                              Attorneys for Defendant
                                                WAL-MART REAL ESTATE BUSINESS
16                                              TRUST

17

18

19

20

21

22

23

24

25

26

27  [2] Save Mart Supermarket's Motion for Partial Summary Judgment, Case No. 3:07-cv-01480-MMC,
    Document 54, filed 3/28/08 at 13:22-24.
28                                              4
                                                              NOTICE OF REMOVAL

143262V2

# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
WAL-MART REAL ESTATE BUSINESS TRUST, a Delaware Statutory Trust

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
SAVE MART SUPERMARKETS, d/b/a FOOD MAXX, a California Corporation

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

ENDORSED
FILED

JUL 1 5 2008

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia. Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Sonoma County Superior Court<br>Sonoma County Hall Of Justice<br>600 Administration Drive Room 107J<br>Santa Rosa, CA 95403<br>(707)521-6500 | CASE NUMBER:<br>*(Número del Caso):*  SC V 2-2 3 2 1 0 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gregory P. O'Hara, Esq., Daniel J. Muller          408-292-5800 (phone)     408-287-8040 (fax)
THELEN REID BROWN RAYSMAN & STEINER LLP
225 West Santa Clara Street, 12th Floor
San Jose, California 95113

DATE:  JUL 1 5 2008   DENISE L. GORDON   Clerk, by   KAREN TUMANENG   , Deputy
*(Fecha)*                              *(Secretario)*                                      *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.
www.USCourtForms.com

| SUPERIOR COURT OF CALIFOR...A, COUNTY OF SONOMA<br>CIVIL DIVISION<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878<br>(707) 521-6500<br>www.sonomasuperiorcourt.com | (FOR COURT USE ONLY)<br><br>ENDORSED<br>FILED<br><br>JUL 1 5 2008<br><br>SUPERIOR COURT CF CALIFORNIA<br>COUNTY OF SONOMA |
|---|---|
| NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,<br>NOTICE OF CASE MANAGEMENT CONFERENCE,<br>and ORDER TO SHOW CAUSE | Case number:<br><br>SCV⸱243240 |

## A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT
## AND WITH ANY CROSS-COMPLAINT

1. **THIS ACTION IS ASSIGNED TO HON. _____MARK TANSIL_____ FOR ALL PURPOSES.**
   Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear
   below the number of the case and the nature of the paper on the first page of each paper
   presented for filing.

2. A Case Management Conference has been set at the time and place indicated below:

   | Date: NOV 2 0 2008<br>Location:<br>1450 Guerneville Road<br>Santa Rosa, CA 95403 | Time: 9:00am | Courtroom: 18 |
   |---|---|---|

3. No later than 15 calendar days before the date set for the case management conference or
   review, each party must file a case management statement [Judicial Council form #CM-110] and
   serve it on all other parties in the case. In lieu of each party's filing a separate case management
   statement, any two or more parties may file a joint statement.

4. At the conference, counsel for each party and each self-represented party must appear personally
   or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and
   must be prepared to discuss and commit to the party's position on the issues listed in California
   Rules of Court, Rule 3.727.

5. Pre-approved dispositions are recorded three (3) court days prior to the case management
   conference. These may be obtained by calling (707) 521-6883 or by going to
   http://www.sonomasuperiorcourt.com/tentative/index.php.

## ORDER TO SHOW CAUSE

To Plaintiff(s), Cross-complainants, and/or their attorneys of record:

If, on the date shown above, you are not in compliance with timely filing requirements stated in
California Rules of Court, Rules 3.110 and/or 3.725, you must then and there show cause why this
Court should not impose monetary and/or terminating sanctions.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (*Name & Address*): | *FOR COURT USE ONLY* |
|---|---|
| Telephone No.:                    FAX No.: | |
| ATTORNEY FOR (Name):                    Bar No. | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA**<br>600 Administration Drive<br>Santa Rosa, CA 95403<br>Telephone: (707) 521-6500 | |
| PLAINTIFF(S)/PETITIONER(S): | |
| DEFENDANT(S)/RESPONDENT(S): | CASE NUMBER: |

## NOTICE OF SELECTION AS MEDIATOR IN COURT-CONNECTED MEDIATION
(Sonoma County Superior Court Local Rule 16)

**Name of Mediator Selected:** _____

    **PLEASE TAKE NOTICE** that the above-referenced matter is subject to Sonoma County Superior Court Local Rule 16 (Rules Applicable to Alternative Dispute Resolution (ADR)). The parties have selected you to serve as the mediator in this matter. Sonoma County Superior Court has a voluntary, market rate mediation program. All mediations conducted in cases covered by Local Rule 16 are court-connected mediations and are subject to the provisions of California Rules of Court, Rules 3.850 et seq. It is your obligation to familiarize yourself with Local Rule 16 and California Rules of Court, Rules 3.850 et seq. before the mediation. **PLEASE NOTE:** you are required to have the parties complete an Attendance Sheet for Court-Program Mediation of Civil Case (Alternative Dispute Resolution) (Judicial Council form ADR-107) in accordance with California Rules of Court Rule 3.860. The form is available at the web site of the California Courts www.courtinfo.ca.gov.

    If you *are not* a member of the Sonoma County Superior Court panel of mediators, in order to serve as mediator in this case, you must complete the acceptance below (see CRC Rule 3.851(a) (2)), sign it in the space provided, and file the completed Notice *with your original signature* with the Court not less than five days before commencement of the mediation. Please also provide a courtesy copy of the completed and signed Notice to the ADR Program Coordinator, 1450 Guerneville Road, Building G, Santa Rosa, California 95403 or by facsimile transmission to (707) 521-6756.

    If you are mediating a case referred to court-connected mediation during calendar year 2007, regardless of the date of the mediation, you are required to complete and return a Mediator's Questionnaire (Sonoma County Superior Court Local form CV-36) within five (5) days after completion or other termination of the mediation. The completed questionnaire may be mailed or faxed to ADR Program Coordinator at the above address or FAX number. The plaintiff should provide the Mediator's Questionnaire to you. The questionnaire is also available on the web site of the Sonoma County Superior Court www.sonomasuperiorcourt.com.

    If you have any questions regarding your selection or service as a mediator in this matter or about the Sonoma County Superior Court ADR Program, please feel free to contact the ADR Program Coordinator at (707) 561-6500 or ADR@sonomacourt.org.

### MEDIATOR'S ACCEPTANCE

I, _____ hereby agree to mediate the above-captioned matter subject to
        (print name)

the conditions stated in this notice.

Dated: _____     _____
                                                    (Mediator's Signature)

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                                FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878 | |
|---|---|
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |

| ADR INFORMATION SHEET<br>[Sonoma County Superior Court Rules, Rule 16] | CASE NUMBER: |
|---|---|
| (Check one):  ☐ UNLIMITED CASE<br>(Amount demanded exceeds $25,000)  ☐ LIMITED CASE<br>(Amount demanded is $25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

## NOTICE TO ALL PARTIES AND THEIR ATTORNEYS

The policy of the Sonoma County Superior Court is:

"The formal litigation of legal claims and disputes is expensive and time consuming. The overall results achieved by some or all of the parties are often unsatisfactory. There are many modern alternatives to formal court litigation which are less expensive, less time consuming, and more beneficial to the parties. It is therefore the firm policy and goal of this court to encourage the parties in all civil cases to explore and pursue private dispute resolution alternatives at the earliest possible date." (Local Rule 16.1.)

Although most (90-98%) cases do settle, many settlements come only after a considerable amount of time, money, and resources have been expended. Such expenditures, as well as the adversarial nature of litigation, can be a disincentive to settlement. The Sonoma County Superior Court encourages the use of Alternative Dispute Resolution (ADR) as early as possible after the parties become aware of a dispute.

Most ADR processes are voluntary and are paid for by the parties themselves, but ADR has proved in many cases to be faster, cheaper, and more effective than traditional litigation.

## ADVANTAGES OF ADR:

The filing of your complaint or answer may be just the beginning of the costs that you will incur during the course of your lawsuit. Lawsuits can be extremely costly. By utilizing ADR methods early in the course of your case, you may significantly reduce these costs by either resolving the case before expensive discovery and trial proceedings are commenced or by narrowing the scope of your discovery by identifying disputed and undisputed factual and legal issues.

ADR can be a fast, economical, efficient, and effective way to resolve civil cases, and most litigants report satisfaction with the process. ADR procedures can be scheduled at your convenience and can be completed in a fraction of the time required for traditional litigation. The cost of ADR will depend on the procedure and the provider you select, and the cost is typically less than litigation.

Most ADR processes are confidential but can result in enforceable agreements. Many ADR processes will give you an opportunity to test the strengths and weaknesses of your case without adverse impact in the event of a trial. Depending upon the method of ADR you select, it may be the last chance for you to control the outcome of your dispute before you place the decision in the hands of a judge or jury.

## METHODS OF ADR:

**A. MEDIATION:** Mediation is one of the most frequently used methods of ADR because it is informal, quick, convenient and confidential. In this process the parties select a neutral mediator who facilitates the identification of issues and areas of agreement and assists in finding a resolution or settlement of the dispute. Since mediation requires the agreement of the parties to resolve the matter, control of the proceedings and a determination of the settlement terms remains completely in the parties' hands. The mediator remains neutral and assists the parties in arriving at terms that are mutually agreeable.

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**B. ARBITRATION:** The parties jointly employ a neutral third party or a panel of neutrals to listen to both sides and render a decision. The parties are free to make the arbitrator's decision binding or non-binding. When non-binding, the arbitrator's decision serves as guide or influence upon the parties to bring them closer to settlement. If it is binding, the decision of the arbitrator will be final and generally avoids any further proceedings in the case. Non-binding judicial arbitration may be ordered in certain cases before trial.

**C. EARLY NEUTRAL EVALUATION:** A neutral evaluator is hired by the parties to give an evaluation of the case to help settle it. You or your attorney will be permitted to prepare a written statement, present critical witnesses or other evidence, argue your case to the evaluator, meet separately and confidentially with the evaluator, and utilize the evaluator to communicate any settlement offers to the opposing party.

**D. PRIVATE SETTLEMENT CONFERENCE:** A voluntary settlement conference is similar to early neutral evaluation in that the parties employ a neutral settlement officer who attempts to persuade the parties to accept a compromise position. It is a form of facilitated negotiation in which the settlement officer may express an opinion about the value of the case, the substantive merits of each party's position, and the probable outcome of the trial.

There are various other methods or combinations of methods of ADR, such as summary jury trial, mini-trial, special master and discovery referee. The court encourages the parties to be creative in selecting the process which has the best chance of resolving the case as quickly, effectively, and inexpensively as possible. You will have a chance to review your ADR options at the time of the Early Mediation and Case Management Conference.

The undersigned party is willing to agree to any of the following forms of ADR at this time (for family law and probate actions only). Your selection will inform the other parties in the case of your current thoughts regarding the use of ADR. If all parties agree on a particular ADR method, you will be asked to file a stipulation on the court's form. The stipulation form (Sonoma County Superior Court form #MISC-101) can be found at the court's web site and is available at the court.)

☐ Mediation   ☐ Early Neutral Evaluation
☐ Non-binding Private Arbitration   ☐ Binding Private Arbitration
☐ Voluntary Settlement Conference   ☐ Summary Jury Trial
☐ Other   ☐ Judicial Arbitration

I / We certify that I / We have read and understood (or have had explained to me / us) the foregoing.

Date: _____   Signature of Party

Date: _____   Signature of Party

Date: _____   Signature of Attorney for Party   ☐ Additional signatures are attached

**NOTE: This form requires the signatures of the parties and their attorney. All parties must complete, file and serve this form in accordance with Sonoma County Superior Court Rules, Rule 16. See Rule 16.3 for specific filing and service instructions.**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:           FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA
600 ADMINISTRATION DRIVE, ROOM 107-J
SANTA ROSA, CALIFORNIA 95403-2878

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **STIPULATION AND ORDER REFERRING MATTER TO ALTERNATIVE DISPUTE RESOLUTION** | CASE NUMBER: |
|---|---|
| (Check one):  ☐  **UNLIMITED CASE**<br>(Amount demanded<br>exceeds $25,000)  ☐  **LIMITED CASE**<br>(Amount demanded is<br>$25,000 or less) | Date:<br>Time:<br>Location:<br>Assigned Judge: |

The parties hereby stipulate to refer the case to the following Alternate Dispute Resolution Process:

☐ Mediation              ☐ Non-binding Private Arbitration
☐ Binding Private Arbitration     ☐ Private Settlement Conference
☐ Early Neutral Evaluation       ☐ Judicial Arbitration

The ADR process will be conducted by (name of individual): _____

Provider's Address: _____

Provider's Telephone: _____ Fax: _____ E-mail address: _____
☐ No agreement
The ADR process will be conducted on (date): _____
☐ No agreement

☐ The parties have reached agreement as to the payment of fees of ADR provider.
☐ The parties have not reached agreement as to the payment of fees of ADR provider.

Type or print name of ☐ Party without attorney ☐ Attorney for         _____
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant     **(Date and Sign)** Attorney or party without attorney (Sign in blue ink)

Type or print name of ☐ Party without attorney ☐ Attorney for         _____
☐ Plaintiff/Petitioner ☐ Defendant/Respondent/Contestant     **(Date and Sign)** Attorney or party without attorney (Sign in blue ink)

☐ Additional signatures are attached

| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | CASE NUMBER: |
| --- | --- |

## ORDER

**A REVIEW HEARING IS SCHEDULED AS FOLLOWS:**

_____         _____
                    Date                                          Time

All parties must appear at the Review Hearing. In the event that the case is settled and a dismissal, a notice of settlement or a judgment is filed at least 3 court days before the scheduled Review Hearing, the Review Hearing will be dropped and no one should appear. You must check the phone message at _____or go to http://www.SonomaSuperiorCourt.com/tentative/index.html where the tentative dispositions will be posted the day before you are scheduled to come to court to determine if you must appear.

***THE FIRST ATTORNEY OR PARTY LISTED MUST FILE PROOF OF SERVICE OF A COPY OF THIS ORDER ON ALL PARTIES.***

_____         _____
                    Date                                  JUDGE OF THE SUPERIOR COURT

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
    STREET ADDRESS:
    MAILING ADDRESS:
    CITY AND ZIP CODE:
    BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | | CASE NUMBER: |
|---|---|---|
| **(Check one):** ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) | ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                              Time:                        Dept.:               Div.:                    Room:

Address of court *(if different from the address above)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Page 1 of 4

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

10

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in (check all that apply):
   (1) ☐ Mediation
   (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
   (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
   (4) ☐ Binding judicial arbitration
   (5) ☐ Binding private arbitration
   (6) ☐ Neutral case evaluation
   (7) ☐ Other (specify):

   e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
   f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
   g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court (specify exemption):

**11. Settlement conference**
   ☐ The party or parties are willing to participate in an early settlement conference (specify when):

**12. Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement (name):
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case (explain):

**13. Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
   ☐ Bankruptcy ☐ Other (specify):
   Status:

**14. Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 14a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by (name party):

**15. Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action (specify moving party, type of motion, and reasons):

**16. Other motions**
   ☐ The party or parties expect to file the following motions before trial (specify moving party, type of motion, and issues):

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

    a. ☐ The party or parties have completed all discovery.

    b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

    c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic Litigation**

    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other Issues**

    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Case management orders**

    Previous case management orders in this case are *(check one)*: ☐ none ☐ attached as Attachment 21.

**22.** Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached

**CASE MANAGEMENT STATEMENT**

1  GREGORY P. O'HARA, CA BAR NO. 131963
   gpohara@thelen.com
2  DANIEL J. MULLER, CA BAR NO. 193396
   dmuller@thelen.com
3  KARIN M. FRENZA, CA BAR NO. 244606
   kfrenza@thelen.com
4  THELEN REID BROWN RAYSMAN & STEINER LLP
   225 West Santa Clara Street, 12th Floor
5  San Jose, CA 95113
   Telephone: (408) 292-5800
6  Facsimile: (408) 287-8040

7  Attorneys for Plaintiff
   SAVE MART SUPERMARKETS

8

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  IN AND FOR THE COUNTY OF SONOMA

12
   SAVE MART SUPERMARKETS, d/b/a      Case No.:   SCV 243210
13 FOOD MAXX, a California Corporation
14              Plaintiff,             COMPLAINT FOR DECLARATORY
                                       RELIEF, ANTICIPATORY BREACH
15      vs.                            AND INJUNCTIVE RELIEF
16 WAL-MART REAL ESTATE BUSINESS
   TRUST, a Delaware Statutory Trust,
17
18              Defendant.
19
20
21
22
23
24
25
26
27
28

ENDORSED
FILED
JUL 15 2008
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

-1-
COMPLAINT

1 | Plaintiff hereby alleges,

2 | **THE PARTIES**

3 | 1.  Plaintiff Save Mart Supermarkets, d/b/a Food Maxx ("Save Mart") is a corporation

4 | incorporated under the laws of the State of California, with its principal place of business in the

5 | State of California. Save Mart operates a Food Maxx store in Santa Rosa, California.

6 | 2.  Save Mart is informed and believes, and on that basis alleges, that Defendant Wal-Mart

7 | Real Estate Business Trust ("Wal-Mart") is a Delaware Statutory Trust, organized and existing

8 | under the laws of the State of Delaware. Save Mart is further informed and believes, and on that

9 | basis alleges, that Defendant Wal-Mart's mailing address is 702 S.W. Eighth Street, Bentonville,

10 | Arkansas, 72716. Save Mart is informed and believes, and on that basis alleges, that Wal-Mart

11 | does business throughout California, and specifically in Sonoma County.

12 | **THE SAVE MART LEASE**

13 | 3.  On June 18, 1984 Great Western Outlet Partners, A California Limited Partnership as

14 | Lessor and Fleming Companies, Inc. as Lessee executed a Build and Lease Agreement, with three

15 | amendments dated, respectively, October 1, 1984, May 31, 1985, and January 8, 1998 ("the Save

16 | Mart Lease"). A true and correct copy of the Build and Lease Agreement, excluding the three

17 | amendments thereto, are attached hereto as Exhibit A.

18 | 4.  Save Mart is the successor-in-interest as the Lessee to the Save Mart Lease.

19 | 5.  WRI Golden State, LLC ("WRI"), a Delaware limited liability company is the successor-

20 | in-interest as the Owner/Lessor to the Save Mart Lease.

21 | 6.  Pursuant to the Save Mart Lease, Save Mart occupies approximately 54,600 square feet of

22 | parcel 4 of the Stony Point Plaza Shopping Center ("the Center").

23 | 7.  Save Mart operates a retail food store at the Center which does business under the name

24 | Food Maxx.

25 | 8.  Paragraph 28 of the Save Mart Lease provides:

26 | LESSOR covenants that it will not permit any person other than the LESSEE to
27 | operate a retail food store of any nature in the shopping center of which the
    | premises are a part or on any adjoining property owned by LESSOR, his assignee,
28 | or his transferees, without first obtaining the LESSEE'S prior written consent;

-2-
COMPLAINT

1    provided, however, LESSEE or its Subleasee is operating the premises as a retail
     food store.

2                              **THE 1986 EASEMENT**

3        9.  On January 22, 1986, Great Western Outlet Company executed an Agreement and Grant of

4    Reciprocal Easements ("the 1986 Easement"), which relates to the use, repair, maintenance,

5    easements, and payment of taxes and assessments on Lot 2, as shown in the City of Santa Rosa

6    Parcel Map number 400, filed September 20, 1984, in Book 361 of Maps, pages 33 and 34,

7    Sonoma County Records.  Lot 2 as described in the 1986 Easement includes Parcel 4.

8        10. The 1986 Easement was made by and between Great Western Outlet Partners, as

9    Declarant, and any and all subsequent owners of any part of the property described.  A true and

10   correct copy of the 1986 Easement is attached hereto as Exhibit B.

11       11. The 1986 Easement was recorded in Sonoma County on February 20, 1986.

12       12. The 1986 Easement particularly describes the land affected and benefited as including

13   Parcel 4 of the Center.

14       13. WRI is a successive owner of the land described in the 1986 Easement.

15       14. Section I.B. of the 1986 Easement provides the Purpose as follows:

16           Declarant intends that the Property be developed as an integrated retail sales
17           complex ("the Shopping Center") for the mutual benefit of all the Parcels.
             Declarant desires to subject the Shopping Center and the Property to a common
18           plan of agreements for the benefit and protection of Declarant and its successors,
             grantees and assigns, including, but not limited to, the grantees of each of the
19           Parcels.  Declarant also desires to provide for easements appurtenant to the Parcels
             for the benefit of such Parcels.  It is the intention of Declarant that both the benefit
20           and burden of the agreements contained herein shall run with the land, and that they
             shall also constitute equitable servitudes enforceable by and against Declarant's
21           successors, grantees and assignees.  The easements provided for herein shall burden
             the apposite servient tenements and benefit the apposite dominant tenements and
22           such benefits and burdens shall run with the land and be enforceable by the owners
23           of the apposite dominant tenements and their successors, grantees and assignees
             against the owners of the apposite servient tenements and their successors, grantees
24           and assignees.

25       15. Section II of the 1986 Easement expressly binds successive owners and users of the land:

26
             Declarant hereby establishes the following general plan for the protection and
27           benefit of the Shopping Center and hereby declares that the Shopping Center and
             the Parcels shall be held, conveyed, transferred, sold, encumbered, used, occupied
28

                                          -3-
                                       COMPLAINT

SV #363687 v1

1    and improved subject to the following agreements, all of which are in furtherance
     of a general plan for the Shopping Center. All of the agreements set forth herein
2    shall run with the Property and shall be binding on all parties having or acquiring
     any right, title or interest therein or thereto or any part thereof and shall be for the
3    benefit of and be binding upon Declarant and inure to the benefit of and be binding
     upon each of the Declarant's successors, grantees, and assignees in the Property.
4    Each successive owner of a Parcel during such person's ownership of such Parcel,
     and each owner having any interest in any portion of the Property is bound hereby
5    for the benefit of the successive owners of the other Parcels, during such person's
     ownership of such other Parcel.
6

7         16. Section III, subsection 2.01.1 of the 1986 Easement provides that "[n]o building other than

8    that constructed on Parcel 4, Site A shall be used as a retail grocery food store except with the

9    consent of the owner of Parcel 4." Under the Save Mart Lease, Save Mart occupies Parcel 4, Site

10   A. As such, the 1986 Easement creates a restrictive covenant limiting the use of parcels in Lot 2,

11   including Sites B and C on Parcel 4.

12        17. Section III, subsection 2.01.2 of the 1986 Easement provides:

13        <u>Lessee Rights</u>. Declarants has granted to one of more of the Lessees under the
          terms of the Leases, rights co-extensive with the rights granted to or reserved by the
14        owner of Parcel 4 pursuant to the terms of this Agreement. To the extent that a
          Lessee has been granted such rights under its Lease, that Lessee may enforce those
15        rights directly and independently against any parcel owner. The rights granted to
          or reserved by the owner of Parcel 4 shall be deemed granted or reserved for the
16        benefit of the Lessee to the extent that co-extensive rights have been granted to that
          Lessee under its Lease, and the Lessee for purposes of enforcing its rights under its
17        Lease and this Agreement, shall be deemed a party hereto.

18        18. The 1986 Easement's limitations on the use of Parcel 4 create a negative equitable

19   servitude.

20        19. Great Western Outlet Company is the grantor of the negative equitable servitude described

21   in Section III, subsection 2.01.1 of the 1986 Easement. WRI is the successor grantor of the 1986

22   Easement.

23        20. Save Mart is the successor grantee and beneficiary of the negative equitable servitude

24   described in Section III, subsection 2.01.1 of the 1986 Easement.

25        21. Wal-Mart was provided notice of the 1986 Easement in Section 4, Use Of Premises, in the

26   Ground Lease agreement between Wal-Mart and WRI dated May 16, 2003.

27

28
                                                    -4-

SV #363687 v1

1                          <u>THE WAL-MART LEASE</u>

2      22. On May 14, 2003 WRI entered into a lease agreement with Wal-Mart ("The Wal-Mart

3   Lease") in which Wal-Mart has agreed to lease currently unoccupied space located on Parcel 4 of

4   the Center ("Santa Rosa Wal-Mart").  Specifically, Wal-Mart has leased the space described in the

5   1986 Declaration as Parcel 4, Site B and Parcel 4, Site C.

6      23.  Save Mart is informed and believes, and on that basis alleges, that the Wal-Mart Lease

7   prohibits Wal-Mart from engaging in activity otherwise granted exclusively to any other tenant of

8   the Center as well as from engaging in activity prohibited by the 1986 Easement.

9      24. Save Mart is informed and believes, and on that basis alleges, that the Wal-Mart Lease

10   specifically requires that Wal-Mart honor the exclusivity clause in the Save Mart Lease, such that

11   Wal-Mart may not operate a retail food store of any nature at the Center.

12      25. Based on the express language of the Wal-Mart Lease, Save Mart is an intended third-party

13   beneficiary to the Wal-Mart Lease.

14                          <u>WAL-MART'S CONDUCT</u>

15      26. On or about December, 2005, Wal-Mart filed a Draft Environmental Impact Report with

16   the City of Santa Rosa.  Table 2-2 of the ("DEIR") lists that "Food" will be sold at the Santa Rosa

17   Wal-Mart.  Furthermore, Wal-Mart submitted, as part of the DEIR, a floor plan for the Santa Rosa

18   Wal-Mart depicting several aisles of food to be sold.  Save Mart is informed and believes, and on

19   that basis alleges, that Wal-Mart intends to operate a retail store for the sale of food and groceries.

20      27. WRI has not obtained written consent from Save Mart which would permit Wal-Mart to

21   operate a retail food store of any nature or a retail grocery food store on the unoccupied portion of

22   parcel 4 adjacent to Food Maxx.  Save Mart has expressly told WRI and Wal-Mart that it does not

23   consent and, in fact, Save Mart objects to any operation of a retail food store of any nature in the

24   Center by Wal-Mart.

25      28. A Declaration of the parties' rights and duties regarding the Save Mart Lease, the Wal-

26   Mart Lease and the 1986 Easement will serve a useful and immediate purpose of clarifying Save

27   Mart's and Wal-Mart's legal rights and relations.

28

SV #363687 v1

## FIRST CAUSE OF ACTION

### (Declaratory and Injunctive Relief)

29.     Save Mart hereby incorporates the allegations contained in paragraphs 1 through 28, inclusive, as though set forth in full.

30.     An actual controversy has arisen and now exists between Save Mart, on the one hand, and Wal-Mart, on the other hand, in that Save Mart contends that Wal-Mart has stated its intent to, and will, engage in activity in violation of the Save Mart Lease, the Wal-Mart Lease and the 1986 Easement by operating a retail food store of some nature and/or a retail grocery food store in the Center. Save Mart is informed and believes, and on the basis alleges that Wal-Mart denies this contention.

31.     Save Mart seeks a declaration that the operation of a retail food store of any nature and/or a retail grocery food store by Wal-Mart in the Center violates the Save Mart Lease, the Wal-Mart Lease and the 1986 Easement.

32.     A judicial determination is necessary and appropriate at this time in order that the parties may ascertain their rights and duties under the Save Mart Lease, the Wal-Mart Lease and the 1986 Easement.

33.     Save Mart seeks injunctive relief against Wal-Mart, enjoining Wal-Mart from operating a retail food store of any nature or a retail grocery food store in the Center.

34.     Unless enjoined and restrained by order of this Court, Wal-Mart's operation of a retail food store of any nature or a retail grocery food store at the Center will cause great and irreparable injury to Save Mart by diminishing the value, usefulness and economic value of its Food Maxx Store, and said use by Wal-Mart interferes with Save Mart's use and enjoyment of the property under its lease.

WHEREFORE, Save Mart prays for judgment against Wal-Mart as set forth below.

## SECOND CAUSE OF ACTION

### (Anticipatory Breach of the 1986 Easement)

35.     Save Mart hereby incorporates the allegations contained in paragraphs 1 through 34, inclusive, as though set forth in full.

-6-
**COMPLAINT**

1    36.    Wal-Mart's clear, positive, and unequivocal public statements that it will sell food

2    in its Santa Rosa Wal-Mart constitute a repudiation of the 1986 Easement which prohibits anyone

3    other than Save Mart from operating a retail grocery food store in the Center.  Such repudiation by

4    Wal-Mart, if permitted, will wrongfully interfere with Save Mart's real property rights and use of

5    the easement.

6    37.    Unless enjoined and restrained by order of this court, Wal-Mart's wrongful

7    interference with the easement will cause grave and irreparable injury to Save Mart by diminishing

8    the value, usefulness and economic value of its Food Maxx Store, and the Save Mart Lease.

9    Further, said use by Wal-Mart interferes with Save Mart's use and enjoyment of the property

10    under the 1986 Easement.

11    38.    Save Mart has no adequate remedy at law for Wal-Mart's repudiation of the 1986

12    Easement in that if Wal-Mart is not enjoined, on information and belief, Wal-Mart will as soon as

13    reasonably practical, begin operating a retail grocery food store in the Center.

14    WHEREFORE, Save Mart prays for judgment against Wal-Mart as set forth below.

15    <u>**THIRD CAUSE OF ACTION**</u>

16    **(Anticipatory Breach of the Save Mart Lease)**

17    39.    Save Mart hereby incorporates the allegations contained in paragraphs 1 through

18    38, inclusive, as though set forth in full.

19    40.    Wal-Mart entered into the Wal-Mart Lease with full knowledge of the restrictive

20    covenants contained in the Save Mart Lease.

21    41.    Wal-Mart's clear, positive, and unequivocal public statements that it will sell food

22    in its Santa Rosa Wal-Mart constitute a repudiation of the equitable servitude created by the Save

23    Mart Lease which prohibits anyone other than Save Mart from operating a retail food store of any

24    nature in the Center.  Such repudiation by Wal-Mart, if permitted, will wrongfully interfere with

25    Save Mart's use and enjoyment of the Save Mart Lease.

26    42.    Unless enjoined and restrained by order of this court, Wal-Mart's wrongful

27    interference with the Save Mart Lease will cause grave and irreparable injury to Save Mart by

28    diminishing the value, usefulness and economic value of its Food Maxx Store and the Save Mart

-7-
COMPLAINT

1 | Lease. Further, said use by Wal-Mart interferes with Save Mart's use and enjoyment of the

2 | property under the Save Mart Lease.

3 |     43.    Save Mart has no adequate remedy at law for Wal-Mart's repudiation of the

4 | equitable servitude created by the Save Mart Lease in that if Wal-Mart is not enjoined, on

5 | information and belief, Wal-Mart will as soon as reasonably practical, begin operating a retail food

6 | store in the Center.

7 |     WHEREFORE, Save Mart prays for judgment against Wal-Mart as set forth below.

8 |     <u>**FOURTH CAUSE OF ACTION**</u>

9 |     **(Anticipatory Breach of the Wal-Mart Lease)**

10 |     44.    Save Mart hereby incorporates the allegations contained in paragraphs 1 through

11 | 43, inclusive, as though set forth in full.

12 |     45.    By the express terms of the Wal-Mart Lease, Save Mart is an intended beneficiary

13 | of the use restrictions on Wal-Mart contained in the Wal-Mart Lease. Such restrictions include, in

14 | part, those contained in the Save Mart Lease and the 1986 Easement.

15 |     46.    Wal-Mart's clear, positive, and unequivocal public statements that it will sell food

16 | in its Santa Rosa Wal-Mart constitute a repudiation of the Wal-Mart Lease which prohibits anyone

17 | other than Save Mart from operating a retail food store in the Center. Such repudiation by Wal-

18 | Mart, if permitted, will wrongfully interfere with Save Mart's use and enjoyment of the third party

19 | benefits conveyed to Save Mart in the Wal-Mart Lease.

20 |     47.    Unless enjoined and restrained by order of this court, Wal-Mart's wrongful

21 | interference with the third party benefits conveyed to Save Mart in the Wal-Mart Lease, will cause

22 | grave and irreparable injury to Save Mart by diminishing the value, usefulness and economic

23 | value of its Food Maxx Store and the rights and benefits conferred upon it as a third party

24 | beneficiary to the Wal-Mart Lease.

25 |     48.    Save Mart has no adequate remedy at law for Wal-Mart's repudiation of the Wal-

26 | Mart Lease in that if Wal-Mart is not enjoined, on information and belief, Wal-Mart will as soon

27 | as reasonably practical, begin operating a retail food store of some nature in the Center.

28 |

SV #363687 v1

1    WHEREFORE, Save Mart prays for judgment against Wal-Mart as set forth below.

2                                          **PRAYER**

3    WHEREFORE, Save Mart prays for relief as follows:

4         1.  For an Order declaring that Wal-Mart must honor the terms of the Save Mart Lease, the

5    Wal-Mart Lease and the 1986 Easement and specifically providing that Wal-Mart's operation of a

6    retail food store of any nature, retail food store or a retail grocery food store in the Center in the

7    Santa Rosa Wal-Mart constitutes violations of those agreements.

8         2.  For an injunction prohibiting Wal-Mart from operating a retail food store of any nature,

9    retail food store or a retail grocery food store in the Center.

10        3.  For a preliminary injunction, during the pendency of this action, to enjoin and restrain

11   Wal-Mart from operating a retail food store of any nature, retail food store or a retail grocery food

12   store in the Center.

13        4.  For attorney's fees and costs of this lawsuit; and

14        5.  For such other relief as this Court may deem proper.

15

16   Dated:  July 11, 2008

17                                    THELEN REID BROWN RAYSMAN & STEINER

18

19                             By

20                                    Gregory P. O'Hara
                                     Daniel J. Muller
21                                   Karin M. Frenza
                                     Attorneys for Plaintiff Save Mart Supermarkets

22

23

24

25

26

27

28

**COMPLAINT**

SV #363687 v1

**EXHIBIT A**

BUILD AND LEASE AGREEMENT

LESSOR

GREAT WESTERN OUTLET PARTNERS,
A California Limited Partnership

LESSEE

FLEMING COMPANIES, INC.

EXECUTED

SANTA ROSA OUTLET MALL
HIGHWAY 12 AND STONY POINT ROAD
SANTA ROSA, CALIFORNIA

INDEX
Page 2

|  | PARAGRAPH | PAGE |
|---|---|---|
| CONDEMNATION--FOR REPAIRS | 17 | 26 |
| CONDEMNATION | 18 | 27 |
| HOLDING OVER | 19 | 30 |
| SHOWING BY LESSOR | 20 | 30 |
| RELATIONSHIP OF PARTIES | 21 | 30 |
| PARKING AREA | 22 | 30 |
| UTILITIES | 23 | 31 |
| LESSEE DEFAULT | 24 | 31 |
| LESSOR DEFAULT | 25 | 34 |
| LEASE APPLIES TO BUSINESS ON PREMISES | 26 | 35 |
| INSURANCE MAY BE PROVIDED BY SUBLESSEE OR ASSIGNEE | 27 | 35 |
| EXCLUSIVE | 28 | 36 |
| ALTERATIONS OR ADDITIONS | 29 | 36 |
| SHOPPING CENTER OCCUPANCY | 30 | 36 |
| RIGHT TO CLOSE STORE | 31 | 37 |
| PERMANENT CLOSURE | 31 | 37 |
| SUBLET OR ASSIGN | 32 | 39 |
| LESSOR'S EXCLUSIVE | 32 | 39 |
| LESSOR'S WAIVER | 33 | 40 |
| NOTICES | 34 | 40 |
| CAPTIONS | 35 | 40 |
| ADVANCE POSSESSION FOR FIXTURES | 36 | 41 |
| SUBORDINATION | 37 | 41 |
| BINDING EFFECT | 38 | 42 |
| MERGER | 39 | 42 |
| TIME | 40 | 42 |
| CHOICE OF LAWS | 41 | 42 |
| COMPLIANCE WITH LAWS & ORDINANCES | 42 | 42 |
| MECHANICS & MATERIALMANS LIENS | 43 | 43 |
| ESTOPPEL CERTIFICATE | 44 | 44 |
| FORCE MAJEURE | 45 | 44 |
| PROMOTION FUND | 46 | 45 |
| NET-NET-NET LEASE | 47 | 45 |
| COMMENCEMENT DATE | | 47 |

## BUILD AND LEASE AGREEMENT

This Agreement is made and entered into this 18th day of
JUNE , 1984 , by and between GREAT WESTERN OUTLET
PARTNERS, a California limited partnership, whose address is
254 Sutter Street, 6th Floor, San Francisco, California 94108,
hereinafter called the LESSOR, and FLEMING COMPANIES, INC., an
Oklahoma Corporation with an office at Topeka, Kansas, herein-
after called the LESSEE.

WITNESSETH:

WHEREAS, the LESSOR desires to construct a building
(hereinafter called "the premises"), containing approximately
54,600 square feet and constituting a part of the Santa Rosa
Outlet Mall (hereinafter called the "Shopping Center") which
shopping center is, or will be, located upon the following
described real estate:

**LAND DESCRIP-TION**

Beginning at a point known as the center line
intersection of Stony Point Road and
Sebastopol Road, located within the City of
Santa Rosa, State of California, and being
within Section 27, T7N, R8W, M. D. B. and M;
THENCE, N 5° 11' 22" W 79.70' to a point on
the centerline of Stony Point Road; THENCE S
84° 48' 38" W 59.41' to a point located on
the Easterly property line of the parcel having
assessor's parcel no. 010-410-05, and being
the True point of beginning of the parcel
herein described; THENCE, from the true point
of beginning, continuing on a curve to the
right having a radius of 20.00' and a tangent
of S 5° 11' 22" E, through a central angle of
90° 27' 41" with an arc length of 31.58' to a
point; THENCE, S 85° 16' 19" W 700.00' to a
point; THENCE, N 5° 11' 22" W 961.69' to a
point; THENCE, N 85° 24' 53" E 643.16' to a
point; THENCE, continuing on a curve to the
left having a radius of 2,884.67' and a
tangent of N 85° 22' 02" E, through a central
angle of 0° 48' 45" with an arc length of
40.91' to a point; THENCE, S 5° 32' 40" E
0.15' to a point; THENCE, continuing on a
curve to the left having a radius of 2,884.82'
and a tangent of N 84° 33' 17" E, through a
central angle of 0° 43' 02" with an arc length
of 36.11' to a point; THENCE, S 5° 11' 22" E
940.68' to the true point of beginning.

Containing: 691,847.74 square feet, or 15.88
acres.

NSC                                                          6/84



and the LESSEE desire to lease the premises upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the rents to be paid and the mutual covenants to be performed, the parties hereto agree as follows:

OWNER-
SHIP

1. The LESSOR covenants that it has good title to said real estate, and that the LESSEE, upon paying the rentals herein reserved and observing, performing and keeping all and singular the covenants and agreements herein specified to be kept and performed by LESSEE, shall, and may lawfully, peace-fully, and quietly have, hold, use, occupy, possess and enjoy the premises hereby leased for and during the term hereof, without any hindrance eviction, molestation, or interruption of or by the LESSOR, or any person or persons. LESSOR coven-ants that no zoning or other ordinance, law, regulation, or restrictive covenants prevent use of the leased premises for the intended purpose.

COMMON
AREAS

2. The premises are to be located as approved by the parties as shown on the plot plan marked Exhibit A, attached

Page 2
Lease Agreement

hereto and incorporated herein. LESSOR agrees that the use and occupancy by the LESSEE of the premises shall include the use in common with others entitled thereto in said Shopping Center including its customers, suppliers, visitors and invitees, of the common areas, employees' parking areas, service roads, loading facilities, sidewalks, and customers' parking areas, all as shown on Exhibit A, and all future facilities and common areas designed for common use, all of such areas and facilities being hereinafter collectively termed "common areas", subject, however, to the terms and conditions hereinafter set forth. The LESSOR covenants and agrees that it shall maintain the common areas of the shopping center in good operating condition and repair (hereinafter called "common area maintenance"), adequately drained and reasonably free from rubbish and debris, any grass mowed, and properly landscaped. The LESSOR shall resurface the sidewalk, parking and driveway areas when the same shall be reasonably necessary together with the restriping of the parking areas. The LESSOR shall keep the common areas of the shopping center well lighted during the hours of darkness until 10:00 p.m.

COMMON
AREA
MAINTEN-
ANCE
REIM-
BURSEMENT

LESSEE agrees to pay as LESSEE'S estimated annual pro rata share (determined by the proportion which the number of square feet of floor space in the premises bears to the number of leaseable square feet in the shopping center as depicted on Exhibit A hereof) of the expense of common area maintenance of the shopping center shown on Exhibit "A" attached. For the first year of the lease term, LESSEE'S pro rata share shall be payable monthly in the amount of One Thousand Nine Hundred Eleven Dollars ($1,911.00).

During succeeding years of the lease term and renewal terms, the above described additional rental shall be calcul-

Page 3
Lease Agreement

ated as hereinafter set forth. Within thirty (30) days after the end of each calendar year, during the original term or any renewal term of this lease, LESSOR agrees to furnish to LESSEE a statement itemized in reasonable detail, setting forth the total expenses for such common area maintenance charges for such calendar year. LESSOR and LESSEE shall meet and review said itemized statement; determine LESSEE'S pro rata share thereof (as hereinabove defined) and made adjustments for underpayment of LESSEE'S pro rata share which underpayment LESSEE shall pay with LESSEE'S next monthly payment of said expenses, and for overpayment of LESSEE'S pro rata share, which overpayment shall be credited against LESSEE'S next monthly payment of said expenses. At such meeting LESSOR and LESSEE shall estimate LESSEE'S pro rata share of the expenses of maintaining the common area maintenance for the succeeding calendar year, and LESSEE'S monthly payment of said pro rata share shall be adjusted accordingly.

Common area maintenance expenses are defined as follows: The cost and expense incurred in operating and maintaining the parking lot and common facilities, including, without limitation, cleaning, gardening, landscaping, (including repairs, line painting, lighting, sanitary control, removal of trash, rubbish, garbage and other refuse, depreciation on machinery and equipment used in such maintenance, depreciation on the common facilities, the cost of personnel to implement such services, payroll taxes, the cost of leasing or operating an all-center identification sign, replacing of paving, curbs, walkways, directional or other signs, drainage, the cost to LESSOR of obtaining supervisory services for the above, and four percent (4%) of all the foregoing costs (excluding real estate taxes and assessments) to cover the LESSOR'S administrative and overhead costs.

Page 4
Lease Agreement

EXTENDED HOUR LIGHTING    In the event LESSEE in its sole discretion desires to remain open for business after 10:00 p.m., then as additional rental LESSEE agrees to pay an amount which is the sum computed by multiplying the number of hours LESSEE remains open after 10:00 p.m. times the wattage of common area parking lot lighting and sign identifying the shopping Center times the actual utility rate applicable; provided, that should other tenants in the Shopping Center remain open after 10:00 p.m., then LESSEE shall pay only a pro rata amount arrived at by taking into consideration the number of hours such other tenant(s) remain open for business and the square footage of such other tenants' leased premises. Such additional extended hour lighting charges shall be billed by the LESSOR to the LESSEE being properly documented together with a statement showing the LESSOR'S calculations of the amount due and payable and the LESSEE agrees to pay such extended hour charges on demand. The cost of the installation of a separate meter for the purpose of ascertaining such additional extended hour lighting charges shall be considered a part of the initial building cost.

Notwithstanding anything provided in this Paragraph to the contrary, it is agreed and understood that the LESSEE'S pro rata share of the repair and maintenance costs attributable to common area maintenance of the shopping center shall not include any of the following:

(a). Charge for any item that was or should have been originally constructed under the plans and specifications of the shopping center;

(b). Charge for any item of equipment or capital improvements (capital improvements shall mean a valuable addition made to the premises and common areas in excess of ordinary repairs and maintenance) that is properly chargeable to

Page 5
Lease Agreement

capital expense or capital improvements under recognized and
accepted accounting principles and standards;

3.    The LESSOR agrees to cause construction of the
CONSTRUC- premises and other improvements in accordance with the plot
TION    plan, Exhibit A attached, and the specifications marked
Exhibit B, attached or to be attached hereto and incorporated
herein. This lease shall not be effective until such specifi-
cations, Exhibit B, and the plot plan, Exhibit A, have been so
attached and have been initialed by both parties. The LESSOR
shall provide water, sewer, gas, electrical and other
utilities. LESSEE shall have the right to review the eleva-
tion drawing.

LESSOR and LESSEE agree, the construction costs to be
made by the LESSOR, at LESSOR'S sole cost and expense, pur-
suant to the Plans and Specifications attached hereto as
Exhibit "B", shall not exceed $1,528,800.00. LESSEE reserves
the right to obtain separate bids from other contractor(s),
and should such other bids be less than $1,528,800.00 or less
for such like costs, LESSOR agrees to make such payment to
said other contractor(s) selected and approved by LESSOR and
LESSEE. Should no other contractor(s) be selected by LESSOR
or LESSEE, then in such instance, each party agrees in good
faith, each with the other, to revise and amend said Plans and
Specifications whereby said leasehold improvements for which
the LESSOR is responsible shall not exceed the total sum of
$1,528,800.00 should the parties agree not to amend the plans
and specifications and accept the contractors bid that maybe
either above or below the $1,528,800.00, the rental as set
forth under Paragraph 6A shall be amended as hereinafter set
forth. The construction costs as hereinabove set forth shall
only apply to the construction costs of the LESSEE'S premises
and shall not apply to any construction costs of other build-
ings, nor of the common areas of the shopping center.

Page 6
Lease Agreement

The rental for the first twenty (20) years of the lease as set forth under Paragraph 6A hereof is computed upon the basis of the LESSOR'S construction cost of the LESSEE'S premises to be $28.00 per square foot or $1,528,800.00. Should the LESSOR'S expenses be less than $1,528,800.00, the monthly rental for the first twenty years of the lease as set forth in Paragraph 6A hereof shall be adjusted according to the following formula:

A. Minimum monthly rental LESSOR is to received during the first nine (9) years of the lease. ($5.60 x 54,600 = $305,760 ÷ 12 = $25,480.00); the tenth (10th) lease year through the balance of the lease term ($7.20/x 54,600 = $393,120 ÷ 12 = $32,760.00).

B. Should the construction costs of LESSEE'S premises exceed or be less than $1,528,800.00, then the minimum monthly rental as set forth in Paragraph 6A shall be amended in accordance with the following example:

Existing Monthly Rental: $5.60 x 54,600 = $305,760 ÷ $1,528,800 = .2000%.

Actual construction costs:
   $1,628,800 / $1,528,800 = $100,000
   $1,428,800 - $1,528,800 = $100,000

   $100,000 x .2000 = $20,000.00 ÷ $54,600.00 = 37¢ per square foot annually.

   $5.60 + 37¢ = $5.97 for the first lease year or $5.60 - 37¢ = $5.23 for the first lease year.

C. The minimum monthly rental for all insuing lease years shall be adjusted on a square foot proportionate basis as set forth above.

The LESSOR agrees that, at the option of the LESSEE, this lease shall become null and void if construction of the shopping center, including the premises, is not commenced on or before October 1, 1984, and completed and ready for occupancy on or before June 1, 1985, causes or conditions beyond the control of LESSOR only, excepted; provided, however, that if the premises are not ready for occupancy on or before October 1, 1985, irrespective of cause, and irrespective of whether such cause is beyond the control of LESSOR, LESSEE, in

Page 7
Lease Agreement

its sole discretion is hereby granted the option to cancel and terminate this lease.

Construction of the premises shall not be considered complete until it is substantially completed in every respect; (substantially completed in every respect shall mean complete — except those items listed on punch list, as hereinafter defined, which can be and will be corrected and completed within thirty (30) days by LESSOR in accordance with the specifications, Exhibit B hereof, none of which items would materially interfere with or impair the LESSEE'S use of the premises and to an extent permissable with respect to necessary work to be performed by LESSEE in installing its trade fixtures and equipment) including, but not limited to toilet facilities, office space, vinyl floor covering, automatic pressure-pad doors, light fixtures, including tubes and globes, boiler, heating, refrigerated air conditioning, enclosed machine rooms, curtain walls and partitions, and electrical and plumbing requirements complete to the point of connection of fixtures, equipment, checkstands and signs; interior and exterior decoration completed, parking areas completely surfaced, with adequate lighting and initial traffic control, service roads, sidewalks, loading facilities, all to be in accordance with specifications (Exhibit B) to be supplied by LESSEE. Should LESSOR construct during the term of this lease a sign identifying the shopping center, LESSEE shall have the right to place on such sign identifying the shopping center its sign, which shall be of at least the same size and advertising effect as any sign placed on such sign identifying the shopping center by any other tenant in the shopping center. LESSOR covenants and agrees that neither it nor any other tenant in the shopping center shall construct a sign so as to impair the visibility of or access to the premises.

Page 8
Lease Agreement

LESSEE agrees to accept the premises in the condition existing on the date of the commencement of the term, subject to LESSEE'S list of defective items (hereinafter called "punch list") being completed. In the event of LESSOR'S failure to complete said punch list items within thirty (30) days after receipt of LESSEE'S notification to LESSOR, then at LESSEE'S sole option, LESSEE may either complete such punch list items and deduct the cost thereof from rent, the costs of which are hereby agreed in advance by the parties hereto to be reasonable and proper deductions, or require LESSOR'S specific performance of the same, or seek any other legal remedies available to LESSEE except that LESSEE shall not be entitled to terminate this Lease due to LESSOR'S (including any mortgagee, right, but not the obligation to cure said punch list items) failure to complete punch list items absent another substantial breach of LESSOR'S duties under this Lease. LESSOR covenants that the premises to be constructed shall, at the commencement of the term hereof and subject to LESSEE'S punch list being completed, be structurally sound and in good tenantable condition and that there shall be no latent defects therein. Latent defects as used herein is a defect which is a departure from plans and specifications not apparent upon an ordinary and reasonable inspection by a professional engineer qualified to make such inspection, normal wear and tear excepted. LESSOR further covenants that if any latent defects in the premises become apparent at any time during this lease, and it shall appear that such latent defects existed at the beginning of the term hereof, or resulted from faulty design, workmanship or materials, then LESSOR shall cause the same after receiving written notice from LESSEE, to be repaired and corrected with all reasonable speed. LESSEE shall have the benefit of all warranties accruing to the LESSOR by reason of

Page 9
Lease Agreement

construction of the premises and any installation of equipment thereon.

**TERM**

4.    The LESSOR agrees to, and does hereby, lease the premises to the LESSEE for an original term of twenty (20) years, commencing on the first day the premises are opened for business or forty-five (45) days following the day when the construction of the premises is completed in accordance with the terms of this lease and the premises are ready for occupancy by LESSEE, except for punch list items which can and will be completed within thirty (30) days, as aforesaid, and LESSOR notifies LESSEE of the foregoing whichever is earlier. The commencement date of the term shall be endorsed at the end hereof, and the lease term shall terminate at 11:59 p.m. on the last day of the twenty (20) year term thereafter.

It is agreed that if at the end of the original term of this lease, or any option period hereof, LESSEE, in its sole discretion, shall deem it necessary to remain in occupancy of said premises beyond the termination date of the lease, LESSEE may do so for a period of time up to one hundred twenty (120) days. For any such extension period, the rent will be one and one-half (1.5) times the minimum monthly rent, or one percent (1%) of monthly gross sales, whichever is greater. LESSEE shall give LESSOR sixty (60) days' notice should such extension be necessary. It is agreed that the LESSEE shall not be obligated to open the premises for business nor shall the rent for the premises commence until all streets and highways and parking areas, shown on Exhibit A attached hereto, have been fully paved and are open for public use.

**OPTIONS**

5.    It is further agreed that, at the expiration of the original term, the LESSEE shall have the right, exercisable at its sole option, to extend this lease for three (3) additional term(s) of five (5) years each, upon the same terms and condi-

Page 10
Lease Agreement

tions, except as to guaranteed rent which shall be 90% of the preceding year's combined guaranteed rent and percentage rent; however, in no event shall the combined rent be less than the preceding year's guaranteed rent. The LESSOR shall be notified of the LESSEE's intent to exercise each such option at least six (6) months prior to the end of the then current term. It is further agreed that LESSEE shall have the right, at its sole option, to extend this lease for an additional term not to exceed seven (7) years, if necessary, to permit reconstruction and repair of the premises after its damage or destruction, in accordance with the provisions of Paragraph 16 hereof.

RENT

6.   As rent for the premises, the LESSEE agrees to pay to the LESSOR at 254 Sutter Street, 6th Floor, San Francisco, California 94108, or at such other places as is reasonably designated by LESSOR, the following amounts:

A.   A minimum monthly rental of $25,480.00 during the first nine (9) lease years, thence commencing with the tenth (10th) lease year through the twentieth lease year a minimum monthly rental of $32,760.00.

B.   LESSEE agrees to pay LESSOR as additional rent a sum of money as percentage payments in the amount of one-half percent (1/2%) of all annual gross sales, as defined herein, made from the premises, in excess of $30,576,000, less the annual guaranteed rental paid during such respective annual lease period as provided in Paragraph 6A of this Lease.  LESSEE shall at no time be liable for any percentage payments except those specified herein resulting from actual gross sales (as defined herein) by LESSEE.

C.   Public liability and property damage insurance annual premiums insuring the common areas as set forth in Paragraph 9 hereof.

D.   Fire and expanded coverage insurance annual premiums as set forth in Paragraph 16 hereof.

E.   Repairs and maintenance of the premises as set forth in Paragraph 13 hereof.

F.   As additional rental, LESSEE'S annual proportionate share of common area maintenance cost, as defined and payable as set forth in Paragraph 2 hereof, annually adjustable.

Page 11
Lease Agreement

G. The sums as set forth in Paragraph 48 hereof for the promotional fund and grand opening of the shopping center.

GROSS
SALES
DEFINED

The term "gross sales", as used herein, shall include all sales of merchandise from, through, or off the premises, including the performance of any service for any customer or patron for compensation by the LESSEE or employee, and shall include all sales by every department thereof, for cash or on a charge basis, and including all business in which orders come by mail, telephone, or telegraph, less credit for returned merchandise, merchandise trade-ins, and credits of a similar nature. "Gross sales" shall not include sales, luxury, excise or other taxes collected by LESSEE from customers and charged separately, merchandise transfers from one of the LESSEE'S or a SUBLESSEE'S stores to another, return of merchandise to a supplier, wholesale bakery or wholesale delicatessen sales, or sales of money orders or vending machine receipts except to the extent of royalties actually received by LESSEE.

LESSOR shall have the right, at any time, but no more than once a year, and from time to time, to have audits made of the records of sales which occur on the premises. LESSOR'S right to examine the books and records pertaining to the operation of a business on the premises, or to make an audit thereof in respect to any lease year, shall be limited to the then current lease year, plus the year immediately preceding. The expense of each such audit shall initially be borne by LESSOR. LESSEE shall reimburse the reasonable cost of any such audit which discloses that LESSEE reported less than ninety-five percent (95%) of the actual gross sales in any lease year. LESSEE'S statements for other prior lease periods shall be deemed to have been accepted by LESSOR and be incontestible.

LESSEE shall report its sales on a monthly basis to LESSOR prior to the twentieth (20th) of the following month.

Page 12
Lease Agreement

LEASE
YEAR
DEFINED

The term "lease year", as used in this Lease, means the following:

1. With reference to the first lease year, the period from the commencement date of the term of this Lease through the last day of the twelfth (12th) full calendar month thereafter.

2. With reference to any succeeding lease year (with the exception of the last lease year), twelve (12) full consecutive calendar months commencing on the first day of the calendar month next succeeding the last day of the preceding lease year.

3. With reference to the last lease year, the period commencing on the first day of the calendar month next succeeding the last day of the preceding lease years and terminating on the last day of the lease term.

MINIMUM
RENT

TIME OF
PAYMENT

The minimum monthly rent for each full calendar month, running from the first day of that month to the last day of that month, shall be paid, in advance, on or before the tenth (10th) day of the month.

If the commencement date of the term of this lease shall be other than the first day of a calendar month, the rent for such partial month shall be calculated and paid on a proportionate basis, so that thereafter rent may be calculated and paid for even calendar months.

PERCENT-
AGE RENT

TIME OF
PAYMENT

Payment of any additional rental, as outlined in Paragraph 6B herein, shall be paid on or before the twentieth (20th) day of the month following the ending of each annual period.

LESSOR
MORT-
GAGES

7. All mortgage payments or other charges required to discharge any lien or encumbrance that may affect the premises, and for which the LESSOR is solely responsible; and which is superior and prior to the terms of this lease, and the rights of LESSEE hereunder, shall be paid by the LESSOR as the same shall become due.

TAXES
AND

8. LESSEE agrees to pay to the LESSOR, on demand, the amount of all taxes and assessments levied and assessed

Page 13
Lease Agreement

ASSESS-
MENTS     against the premises and the proportionate share (as hereafter set forth) of the parking and common areas of the shopping center and that shall become due and payable during the original or any exercised renewed term hereof. If the shopping center is taxed as a unit, the LESSEE shall be liable for only such proportion of such taxes and assessments as the number of square feet of floor space in the premises bears to the total number of leaseable square feet of floor space in the shopping center as depicted on Exhibit A. Such taxes and assessments must be billed by LESSOR to LESSEE no later than ninety (90) days after receipt of notice from the local taxing authority to LESSOR. LESSOR shall be required to send LESSEE receipted tax bill showing payment for taxes as well as special assessments. If such notice is not received by LESSEE within ninety (90) days, LESSEE'S obligation to pay such taxes and assessments will be considered to be null and void. Provided, however, that for any partial tax year occurring during the original or any renewed term hereof, the LESSEE shall be liable for only that portion of such taxes and assessments as the number of days in such partial tax year bears to 365.

Any taxes and assessments levied and assessed against the premises that shall become due and payable during the term hereof and which LESSEE has agreed to pay, may be contested by LESSEE, by appropriate proceedings, in LESSOR'S or LESSEE'S name and LESSOR will offer no objections, will cooperate with LESSEE, will provide any information requested by LESSEE, and will execute any document which may be necessary and proper for such proceedings. Any refund shall be the property of LESSEE to the extent it is based upon the payment of any assessments made by LESSEE.

If the leased premises are part of a shopping center or constitute part of a tract which is assessed as a whole, then

Page 14
Lease Agreement

LESSEE may at its option contest any such tax assessment, and any refunds shall be the property of LESSEE to the extent it is based upon the payment of a prorata share of an assessment made by LESSEE. In the event LESSOR shall contest any taxes and assessments, LESSEE shall be immediately notified in writing.

ASSESS-
MENTS
MADE
DURING
LEASE
TERM

In the event during the term of this lease or any extension thereof, an assessment is placed upon the premises by any taxing authority of competent jurisdiction, and if such assessment is payable or may be paid in installments, then and in that event such assessment shall be paid by installments and LESSEE shall be liable to pay said assessment only to the extent of making timely payment of those installments falling due during the term of this lease or any extension thereof. Further, if any assessment be proposed by any competent taxing authority during the term of this lease or any extension thereof, then upon the request of LESSEE, LESSOR and any mortgagee or bond trustee shall use their best efforts to obtain any assessment which is payable or may be paid in installments.

In the event during the term of this lease or any extension thereof, an assessment is placed upon the premises by any taxing authority of competent jurisdiction and such assessment be payable only in lump sum, then and in that event LESSEE shall be liable only for payment of a proportionate share of such assessment in the proportion that the number of years remaining in the original term and/or any renewal options then remaining available to LESSEE hereunder bears to the useful life of the improvement against which the assessment is made; said useful life being determined by agreement of the parties or in absence of agreement, by arbitration under the procedures set forth in Paragraph 18 hereof.

Page 15
Lease Agreement

The LESSEE shall also pay all taxes levied and assessed upon property belonging to it and located upon the premises.

LESSEE
HOLD
HARMLESS

9.    The LESSEE agrees to protect and save the LESSOR harmless from any and all claims of others for injuries to persons or property occuring in or upon the premises as defined on page one (1) hereof including reasonable attorney's fees, and arising out of the use, occupancy or operation of said premises by the LESSEE and its sublessees, except such claim for injuries as are caused in any proportion by the negligent, intentional or willful acts of the LESSOR.

PUBLIC
LIABILITY
INSURANCE
OF
PREMISES

LESSEE agrees to maintain, at its own expense, during the full term of this lease, a policy of public liability and property damage insurance in a reputable company authorized to do business in the State of California in which policy LESSOR and LESSEE shall be named as co-insureds, and to furnish current certificates evidencing the existence of such insurance providing that such insurance shall not be cancelled except after thirty (30) days' written notice to LESSOR. Such policy shall provide primary coverage for the benefit of LESSOR and LESSEE in an amount not less than $1,000,000.00 single limit combined bodily injury and property damage each occurrence, to cover all situations where any other person or persons claim bodily injury, death, or property damage in or upon the premises.

PUBLIC
LIABILITY
INSURANCE
OF COMMON
AREA

LESSOR covenants and agrees to maintain, at its own expense, during the full term of this lease, a policy of public liability and property damage insurance in a reputable company authorized to do business in the State of California, in which policy LESSOR and LESSEE shall be named as co-insureds insuring against any liability (including all situations where any other person or persons claim bodily injury or property damage) arising on or about the common

Page 16
Lease Agreement

areas of said Shopping Center as defined in paragraph two (2) hereof, including, but not limited to all common use and parking areas of said Shopping Center and to furnish current certificates evidencing the existence of such insurance providing that such insurance shall not be cancelled except after thirty (30) days' written notice to LESSEE.  Such policy shall provide primary coverage for the benefit of LESSEE and LESSOR in an amount not less than $1,000,000.00 single limit combined bodily injury and property damage each occurrence to cover all situations where any person or persons claim personal injury, death, or property damage on or about said common areas.

**LESSOR'S REIMBURSEMENT OF PREMIUMS**

LESSEE agrees to remit to LESSOR, on an annual basis within thirty (30) days after being billed therefor, the premium for insurance covering the premises and the common and parking areas for said policy(s) as hereinabove provided, subject to LESSEE'S right to obtain a like insurance coverage policy(s) should LESSEE be able to secure such policy(s) on the premises and the common and parking areas at a lower rate for like coverage upon the same terms as herein provided. Should LESSOR not desire to cancel its insurance policy(s) on the premises and the common and parking areas, then LESSOR agrees to deduct the difference between the premium paid or charged by LESSOR and that which would have been paid by LESSEE from amounts due from LESSEE in payment of such insurance coverage within thirty (30) days after being presented reasonable supporting data of the availability of like insurance at a lower rate.

**LESSOR. HOLD HARMLESS**

The LESSOR agrees to protect and save the LESSEE harmless from any and all claims of others for injuries to persons or property occurring on or about common areas and arising out of the use or operation of said common areas including reasonable attorney's fees, except such claims for injuries which are

Page 17
Lease Agreement

caused, in any proportion by the negligent, intentional, or
willful acts of the LESSEE, its agents or employees.

10.   LESSOR and LESSEE each hereby releases the other, and
their respective employees, agents, and every person claiming
by, through, or under either of them, and LESSEE hereby
releases each other tenant in the shopping center of which the
premises are a part, and the employees and agents thereof,
from any and all liability or responsibility (to the other or
anyone claiming by, through, or under them by way of subroga-
tion or otherwise), for any loss or damage to any property
(real or personal) owned by or belonging to LESSOR, LESSEE,
their respective employees, agents and every person claiming
by, through, or under either of them, (whether by subrogation
or otherwise) caused by fire or any other insured peril
covered by any insurance policies for the benefit of any
party, even if such loss or damage shall have been caused by
the fault or negligence of another party, their employees or
agents.   LESSOR agrees, upon request of LESSEE, to furnish
evidence of such waiver of liability to LESSEE.   All policies
of insurance written to insure all buildings, parking and
common areas, service and delivery areas, improvements, con-
tents, and all other such property (real or personal) shall
contain a proper provision, by endorsement or otherwise,
whereby the insurance carriers issuing the same shall acknow-
ledge  that the insured has so waived and released its right
of recovery against the other party or parties hereto and such
other tenants and shall waive the right of subrogation which
such carrier might otherwise have had against such other party
or parties and such other tenants, all without impairment or
invalidation of such insurance.  The provisions of this para-
graph shall be equally binding upon the inure to the benefit
of any assignee or sublessee of LESSEE.

**WAIVER OF LIA- BILITY**

Page 18
Lease Agreement

REMOVAL

11.   The LESSEE shall have the right to remove any and all furniture, fixtures, and equipment it may have installed on or in the premises provided the LESSEE shall restore any damage, structural or otherwise, to the building resulting from such removal, usual wear and tear excepted.

LESSOR
ENTRY

12.   The LESSOR shall have the right to enter the premises at any reasonable time for the purpose of inspecting the same, or for the purpose of doing anything that may be required under this lease, or for the purpose of doing anything LESSEE may be required to do and shall fail to do. In the event it is reasonably necessary for the LESSOR to make any repairs to the premises that the LESSEE is responsible for, but which the LESSEE has failed to make, LESSEE shall reimburse the LESSOR for the cost thereof on demand, and the LESSOR shall not be responsible to the LESSEE for any loss or damage that the LESSEE may suffer from such repairs, provided that such loss or damage is reasonable under the circumstances.

MAINTEN-
ANCE AND
REPAIR

13.   Except for the LESSOR'S obligations with respect to latent defects as set forth in Paragraph 3 and with the obligations to maintain in good condition, only to the extent as covered by fire and extended coverage insurance, the structural portions of the building including foundation, slabs, walls, and roof. LESSOR agrees to maintain the electrical and plumbing services to the building, LESSEE agrees at its expense to maintain all other portions of the premises and to make all ordinary repairs in and about the premises necessary to preserve them in good order and condition, including roof leaks and roof repair (except as may be covered by LESSOR'S fire and extended coverage insurance policy) and the air conditioning and heating equipment, after expiration of the warranty period stated in Exhibit B. The LESSOR shall have no obligations with respect to such repairs and maintenance.

Page 19
Lease Agreement

If, in the event of an emergency, it shall become necessary to make any repairs hereby required to be made by LESSOR, LESSEE may proceed forthwith to have such repairs made and pay the reasonable cost thereof, whereupon, LESSOR shall reimburse LESSEE for the reasonable cost of such repairs on demand therefor.

LESSEE further agrees that it shall also be obligated to pay its proportionate share of the cost of repair and maintenance of all the common, parking and service areas in the shopping center, such share to be determined by the proportion which the number of square feet of floor space in the premises bears to the total number of leaseable square feet of floor space in the shopping center as depicted on Exhibit A provided however, LESSEE'S pro rata share remain the same should the leaseable square feet be reduced by fire or other casualty. LESSEE shall be billed annually for such proportionate share of such cost with a statement setting forth LESSEE's proportionate share of the aforesaid costs and showing clearly the computations of such costs to be documented with copies of paid invoices.

WASTE        14.  The LESSEE shall not commit waste or permit waste to be committed in or upon the leased premises and, at the termination of this lease, shall surrender and deliver the premises to the LESSOR in as good condition as the same were at the commencement of the term excepting (1) usual wear and tear, (2) acts of God and unavoidable casualties, (3) repair of latent defects for which LESSOR is responsible hereunder, (4) damage or loss for which LESSOR has waived recovery under Paragraph 10 hereof, and (5) other non-insured causes beyond the control of LESSEE.

SIGNS        15.  LESSOR shall have the sole right to approve the design and placement of any and all signs of any nature upon

Page 20
Lease Agreement

the exterior premises; provided, however, that such approval shall not be unreasonably withheld and, further that the size and advertising effect of any sign to be used by the LESSEE shall be substantially equal to any sign permitted to be used by other tenants in the shopping center.

FIRE &
EXTENDED
COVERAGE
INSURANCE

16.  The LESSOR agrees to keep in effect, at its expense, and during the original or any renewed term of this lease, a policy of fire, extended coverage, vandalism and malicious mischief, burglary insurance, and earthquake (including sprinkler coverage), to cover damage to the building or the premises, written by a responsible insurance company author-ized to do business within the state where the premises are located, in an amount equal to not less than ninety percent (90%) of the replacement cost of the premises, and to furnish the LESSEE proof thereof.  Such policy of insurance shall provide protection against the losses so insured against for the benefit of the LESSOR, LESSEE, and any mortgagee as their interests may appear under the terms of this lease and any mortgage agreement, providing that such insurance shall not be cancelled except after thirty (30) days' notice to LESSEE and any mortgage and shall contain the provision of endorsement required by Paragraph 10 hereof.

BLANKET
INSURANCE

The insurance to be provided by LESSOR may be provided pursuant to a blanket insurance policy covering the premises and other locations of LESSOR provided, however, in no event shall the protection afforded by such blanket insurance policy be less than the required hereunder.

LESSOR'S
REIMBURSE-
MENT OF
PREMIUMS

LESSEE agrees to remit to LESSOR, on an annual basis within thirty (30) days after being billed therefor, the annual premium for insurance covering the premises for said policy(s) as hereinabove provided, subject to LESSEE'S right to obtain a like insurance coverage policy(s) covering the

Page 21
Lease Agreement

premises should LESSEE be able to secure such policy(s) on the premises at a lower rate for like coverage.  In the event LESSEE is able to obtain like insurance policy(s) covering the premises at a lower rate, LESSEE shall provide to LESSOR reasonable data supporting the availability of such like insurance policy(s) at a lower rate; whereupon receipt of such data, LESSOR shall have the option, exercisable in its sole discretion and within thirty (30) days after receipt of such data, to cancel its insurance policy(s) covering the premises and obtain LESSEE'S policy(s).  Should LESSOR elect not to cancel its insurance policy(s) and obtain LESSEE'S policy(s), as aforesaid, LESSOR agrees to deduct, from amounts due from LESSEE in payment of LESSOR'S insurance policy(s) covering the premises and within said thirty (30) days, the difference between the premium paid or charged by LESSOR for its insurance policy(s) covering the premises and that which would have been paid by LESSEE for LESSEE'S policy(s) covering the premises.

The premises to be constructed by LESSOR under this lease is to be equipped with an automatic sprinkler system which is more fully described in Exhibit E.  LESSOR further understands that LESSEE'S SUBLESSEE is required to carry fire and extended coverage insurance covering all of its merchandise, furniture, fixtures, and equipment located in and upon the premises. Should the building covered by this lease be rated deficient by Insurance Service Organization or any other rating bureau having jurisdiction, then LESSOR shall pay for any differential amount between the premium paid and that which would have been paid had the building not been rated deficient, and LESSOR agrees to reimburse LESSEE and/or its SUBLESSEE for any differential amount it may incur.  Said differential amount shall be computed and paid annually using the then published

Page 22
Lease Agreement

insurance rates until the defects are cured by LESSOR. Upon LESSOR'S receipt of notice of any deficiencies from any Insurance Service Organization, or any other rating bureau having jurisdiction, or any insurance company, LESSOR agrees to immediately notify LESSEE in writing of said deficiencies.

LESSEE agrees it shall not keep anything within the premises or use the premises for any purpose which will cause an increase in the insurance premium cost or invalidate any insurance policy(s) carried on the premises or other parts of the shopping center. LESSOR agrees it shall not, nor shall it allow any other tenant(s) in the shopping center, to keep anything within their leased premises or on the shopping center, or use their leased premises or the shopping center for any purpose which will cause an increase in the insurance premium cost or invalidate any insurance policy(s) carried on the premises of LESSEE, such other tenant(s) or other parts of the shopping center. In the event of the storing, maintaining or use of anything on the premises which causes an increase in the insurance premium cost, LESSOR agrees it shall look solely to the respective responsible tenant (or to itself should it be in violation) in the shopping center which causes the resulting or premium increase or insurance invalidation, and LESSOR shall provide to the responsible tenant written documentation issued by the insurance carrier setting forth the causes, rate penalty(s) and increased cost(s) attributable thereto. The responsible tenant shall then either (a) remedy the condition causing said penalty or premium increase, bearing any and all original and continuing costs attributable thereto which shall be treated as additional rent due the LESSOR; or (b) should the LESSOR allow or permit, or should the responsible party continue to allow such storing, maintaining, or use to continue, the responsible party shall be

Page 23
Lease Agreement

held accountable solely to the LESSOR, and LESSOR shall look solely to such party for the original and ongoing and continuing costs and expenses attributable thereto which shall be treated as additional rent due the LESSOR. In the event of (a) or (b) as hereinabove provided, each other respective tenant shall be entitled to and have the right of reimbursement from the LESSOR, but any reimbursement shall not exceed such tenant's prorata share of the penalty rate imposed and the other respective tenants of the shopping center shall provide written documented statements to LESSOR setting forth the penalty rates and costs experienced.

DAMAGE AND DESTRUCTION

If, at any time during the original or any renewed term hereof, the premises shall be partially damaged by fire, windstorm, or other casualty, but the extent thereof is not sufficient to deprive the LESSEE of more than twenty-five percent (25%) of the floor space in the premises, then LESSEE shall notify LESSOR thereof in writing and LESSOR, at its expense, shall proceed promptly to rebuild and repair such portion of the premises so damaged or destroyed; and this lease shall continue in full force and effect.

If, at any time during the original or any renewed term hereof, the premises shall be partially or wholly damaged by such casualty, and the extent of such damage shall be sufficient to deprive LESSEE of more than twenty-five percent (25%) of the floor space therein for its purposes, the LESSEE shall notify LESSOR thereof in writing and the rights and obligations of the parties shall be governed by the following:

A.  If such damage shall occur during the first thirteen (13) years of the original term hereof, then at its expense, the LESSOR shall proceed to rebuild and repair such damage, and this lease shall continue in full force and effect.

B.  If such damage shall occur during the last seven (7) years of the original term hereof, or during either of the renewal terms available to LESSEE at its

Page 24
Lease Agreement

option under Paragraph 5, and if within thirty (30) days after the incurrence of such damage, LESSEE shall further notify LESSOR of LESSEE'S intent to exercise options, then still available to it under Paragraph 5, to extend the term hereof for a period of at least seven (7) years following such notification, then LESSOR, at its expense, shall proceed promptly to rebuild and repair such damage, and this lease shall continue in full force and effect. If notice be not so given to LESSOR of LESSEE's intent to exercise such options to so renew the term hereof for such a period of at least seven (7) years, then LESSOR, at its sole option, may elect to rebuild and repair such damage at its expense, by written notice to LESSEE within thirty (30) days after the expiration of the thirty (30) day period, during which LESSEE may give LESSOR notice of election to renew the term hereof, upon the happening of which LESSOR shall so proceed to build and repair such damage, and this lease shall continue in full force and effect. If LESSEE shall fail to so give LESSOR notice of LESSEE'S intent to exercise such option to so renew the term hereof, and LESSOR shall thereafter fail to so give LESSEE notice of LESSOR'S election to rebuild and repair such damage, then this lease shall terminate as of the date of the occurrence of such casualty, the rental shall be adjusted accordingly, and neither party shall have further rights or obligations hereunder.

LESSOR agrees that in the event any building or buildings in the shopping center other than the building containing the demised premises, shall be destroyed or damaged by fire or other hazard, during the term of this lease, or any renewal thereof, except during the last seven (7) years of the then current term, LESSOR shall rebuild and repair said buildings as closely as possible to those building or buildings shown on Exhibit A attached hereto.

Whenever, under the foregoing provisions of this Paragraph 16, LESSOR shall have the obligation to rebuild and repair all or any portion of the premises, other building or buildings and so to continue this lease in full force and effect, the same shall be commenced within thirty (30) days after LESSOR'S obligation so to do becomes fixed by receipt of notice of such damage, or receipt of notice of LESSEE'S intent to exercise the necessary option to renew, or the exercise of LESSOR'S election to rebuild, as the case may be.    LESSOR

Lease Agreement

shall prosecute such rebuilding and repairing diligently and to the end that the premises, other building or buildings will be restored to substantially the same condition as before the occurrence of such damage. If, for any reason whatsoever, rebuilding and repairing is not completed within nine (9) months after receipt of the applicable notices, unless LESSOR be prevented from completing such rebuilding and repairing by causes or conditions beyond its control, then, and in either such events, LESSEE may, at its sole option, terminate this lease by written notice to LESSOR of its intention to do so, - upon the happening of which, rental shall be adjusted as of the date of termination, LESSEE shall have no further rights hereunder, and LESSEE shall have no further interest in the proceeds of said insurance.

Whenever, under the foregoing provisions of this Paragraph 16, LESSOR shall have the obligation to rebuild and repair all or any portion of the premises, other building and buildings, and so to continue this lease in full force and effect, the rentals payable by LESSEE hereunder shall abate from the date of the occurrence of such casualty to the date of completion of such rebuilding and repairing in proportion to LESSEE'S deprivation of use of the premises for its purposes.

Whenever, under the foregoing provisions of this Paragraph 16, the premises shall not be rebuilt or this lease shall be terminated by reason of the exercise or non-exercise of any option herein granted to either the LESSOR or the LESSEE, the LESSEE shall have no further interest in the proceeds of such insurance.

17. The LESSOR agrees that if any authority condemns the shopping center or any part thereof, other than the premises, as being unsafe, or not in conformity with the applicable laws

Page 26
Lease Agreement

CONDEM-
NATION
FOR
REPAIRS

or regulations, the LESSOR, at its own cost and expense, will promptly make such changes, alterations or repairs (structural or nonstructural) as may be necessary to comply with such laws and regulations, or with the requirements of the authority. If, during the time such changes, alterations or repairs are being performed, the premises are rendered unsuitable for occupancy and use by the LESSEE, the rent shall abate, and if only a portion of the premises is rendered unsuitable for such occupancy and use, then the rent shall abate proportionately. Provided, however, in the event the premises or any part thereof are condemned as being unsafe or not in conformity with the applicable laws and regulations due to the defective condition or use of supplies, materials, and/or equipment owned or used by LESSEE, or due to a defective condition of such common facilities or of any part of the premises LESSEE is required to maintain as herein provided, then, and in that event, LESSEE, at its own cost and expense agrees to make such changes, alterations and repairs (structural or nonstructural) in the building and equipment or the use of the same as may be necessary to comply with such laws and regulations, or with the requirements of the authority, but LESSEE shall be entitled to any condemnation award made to LESSOR in respect thereto, if any. If, during the time such changes, alterations, and/or repairs are being performed to the shopping center or to the premises, the premises are rendered untenantable for occupancy and use by LESSEE, the rent shall abate in proportion to the LESSEE'S deprivation of the use of the premises, except where the repairs are LESSEE'S sole responsibility, in which case there shall be no rent abatement.

18.   Upon LESSOR'S receipt of notice from any condemning

CONDEM-
NATION

authority of a proposed condemnation, LESSOR shall immediately notify LESSEE in writing.  If all of the premises shall be

Page 27
Lease Agreement

taken under the right of eminent domain by any authority having the right of condemnation, or if a portion of the shopping center is so condemned as will prevent the practical use of the premises for LESSEE'S purposes, this lease, and all obligations hereunder, shall terminate on the date title vests pursuant to such proceedings.    In the event the proper judicial authority does not divide the award to compensate the separate loss of each party, the total award made in such proceedings shall be equitably distributed between the LESSOR and LESSEE, and if applicable, other tenants occupying space in the shopping center; provided that if the parties cannot agree upon an equitable distribution of such award, either party may petition a court of competent jurisdiction in the state where the premises are located for equitable distribution of such award, and in the event no such court has jurisdiction to determine an equitable distribution of such awards then either party may request arbitration under the terms hereinafter set forth.    If such taking does not prevent the practical use of the premises for the purposes of the LESSEE, then this lease shall continue in full force and effect, but the rent shall abate proportionately, and such other adjustments shall be made as shall be just and equitable.

In any instance in this Agreement in which it is provided that a question shall be determined by arbitration, the following procedure shall govern:

The party desiring arbitration ("First Party") shall give written notice to that effect to the other party ("Second Party"), specifying in said notice the name and address of the person designated to act as arbitrator on its behalf.  Within fifteen (15) days after the service of such notice, the Second Party shall give written notice to the First Party specifying the name and address of the person designated to act as

Page 28
Lease Agreement

arbitrator on its behalf.  If the Second Party fails to notify the First Party of the appointment of its arbitrator, as aforesaid, within or by the time above specified, then the appointment of the second arbitrator shall be made in the same manner as is hereinafter provided for the appointment of a third arbitrator in a case where the two arbitrators are appointed hereunder and the parties are unable to agree upon such third appointment.  The arbitrators so chosen shall meet within ten (10) days after the second arbitrator is appointed, and if, within thirty (30) days after the second arbitrator is appointed, the said two arbitrators shall not agree upon the question in dispute, they shall themselves appoint a third arbitrator who shall be a competent and impartial person; and in the event of their being unable to agree upon such appointment within ten (10) days after the time aforesaid, the third arbitrator shall be selected by the parties themselves if they can agree thereon within a further period of fifteen (15) days.  If the parties do not so agree, then either party, on behalf of both, may request such appointment by the presiding Judge of the U.S. District Court for the Federal District in which the premises are located.  In the event of the failure, refusal, or inability of any arbitrator to act, a new arbitrator shall be appointed in his stead, which appointment shall be made in the same manner as hereinbefore provided for the appointment of such arbitrator so failing, refusing or unable to act.  The decision of the arbitrators so chosen shall be given within a period of thirty (30) days after the appointment of such third arbitrator.  The decision in which any two arbitrators so appointed and acting hereunder concur shall in all cases be binding and conclusive upon the parties.  Each party shall pay the fees and expenses of one of the two original arbitrators appointed by such party, or in whose stead as

Page 29
Lease Agreement

above provided, such arbitrator was appointed, and the fees
and expenses of the third arbitrator and all other expenses,
if any, shall be borne equally by both parties.

**HOLDING**
**OVER**

19.  Except as provided in Paragraph 4, if LESSEE remains
in possession of the premises after the expiration of this
lease, and without the execution of a new lease, it shall be
deemed to be occupying the premises as a tenant from month-
to-month, subject to all the conditions, provisions, and obli-
gations of this lease, including the payment of percentage
rent, insofar as the same are applicable to a month-to-month
tenancy.

**SHOWING**
**BY LESSOR**

20.  LESSOR may, at any time within six (6) months before
the expiration of this lease, enter the premises at allreason-
able hours for the purpose of offering the premises for rent,
subject to LESSEE'S rights, as set out in Paragraph 5.

**RELATION-**
**SHIP**

21.  Nothing contained herein shall be deemed or
construed by the parties hereto, or by any third party, as
creating the relation of principal and agent or of partnership
or of joint venture between the parties hereto.  It is under-
stood and agreed that neither method of computation of rent,
nor any provision contained herein, nor any acts of the
parties hereto, creates a relationship other than the rela-
tionship of LESSOR and LESSEE.

**PARKING**
**AREA**

22.  LESSOR agrees that at no time during the term of
this lease, will the customer parking area, entrances and
exits and service area within the area cross hatched on
Exhibit "A" hereto be reduced in size or configuration from
that shown on the plot plan attached as Exhibit "A", unless
such reduction is made necessary by the exercise of eminent
domain by proper and duly constituted authority or author-
ities, or is done at LESSEE'S request, or results from the
exercise of any right granted LESSEE herein.  Any violation of

Page 30
Lease Agreement

this provision shall entitle the LESSEE either to treat such violation as a default with an option to cancel the lease or to require a proportionate reduction of rent, at LESSEE's sole option.

UTILITIES        23.    LESSEE agrees to pay all electric current, water, gas, and other fuel bills, as determined by separate meters for LESSEE'S space and use. LESSOR, at its sole expense, will provide any and all utility meters, utility hook-up or connection fees or charges for all utilities to the premises.

LESSEE         24.A.   The occurrence of any of the following shall con-
DEFAULT     stitute a default by LESSEE:

1.    Failure to pay rent when due, if the failure continues for fifteen (15) days after notice has been given to LESSOR.

2.    Subject to the provisions of Paragraph 32, LESSEE shall have the right to terminate operation or conduct of business on the premises at any time and shall have no duty to occupy the premises either personally or through any subtenant and the failure of LESSEE to occupy the premises and the failure to conduct a business on the premises shall not be construed to be an abandonment under this lease provided LESSEE is current with rent, taxes, common area maintenance, insurance and any other monetary obligation under this lease.

3.    Failure to perform any other provision of this lease if the failure to perform is not cured within thirty (30) days after notice has been given to LESSEE. If the default cannot reasonably be cured within thirty (30) days, LESSEE shall not be in default of this lease if LESSEE commences to cure the default within thirty (30) day period and diligently and in good faith continues to cure the default.

Page 31
Lease Agreement

a. The worth, at the time of the award, of the unpaid rent that had been earned at the time of termination of this lease;

b. The worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this lease until the time of award exceeds that amount of the loss of rent that LESSEE proves could have been reasonably avoided;

c. The worth, at the time of the award, of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of the loss of rent that LESSEE proves could have been reasonably avoided; and

d. Any other amount, and court costs, necessary to compensate LESSOR for all detriment proximately caused by LESSEE'S default. The worth, at the time of the award, as used in a and b of this paragraph, is to be computed by allowing interest at the maximum rate an individual is permitted by law to charge. The worth, at the time of the award, as referred to in c of this paragraph, is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus 1%.

25.    The LESSOR further covenants with the LESSEE that **LESSOR DEFAULT** if LESSOR shall violate or neglect any covenant, agreement, or stipulation herein contained on its part to be kept, performed or observed, and any such default shall continue for thirty (30) days after written notice thereof is given by LESSEE to LESSOR and LESSOR does not cure such default within said

Page 34
Lease Agreement

LESSEE    thirty (30) days' written notice to LESSOR. . Provided, how-
OR       ever, that LESSEE may satisfy this insurance requirement
ASSIGNEE through the maintenance of such insurance coverage for the
         benefit of LESSOR, as required in Paragraph 9 above, by LESSEE
         or by an assignee or sublessee of LESSEE.

            .28.  LESSOR covenants that it will not permit any person
EXCLUSIVE other than the LESSEE to operate a retail food store of any
         nature in the shopping center of which the premises are a part
         or on any adjoining property owned by LESSOR, his assignee, or
         his transferrees, without first obtaining the LESSEE'S prior
         written consent; provided, however, LESSEE or its Sublessee is
         operating the premises as a retail food store.

            29.  The LESSEE shall have the right to make alterations
ALTERA-  or additions to the premises, provided such alterations or
TIONS OR additions are at its sole cost and expense, and that such
ADDITIONS alterations or additions shall be of good workmanship and mat-
         erial at least equal to that of the original construction, and
         that such alterations or additions neither shall reduce the
         size and strength of the existing building, nor adversely
         affect the market value of the premises; provided, however,
         that no such alterations or additions to the premises which
         shall cost more than Fifty Thousand Dollars ($50,000.00) shall
         be made by the LESSEE without the written consent of the
         LESSOR which consent shall not be unreasonably withheld.  The
         LESSEE shall not be required to remove any such alterations or
         additions or to restore the building to its original condition
         at the termination of this lease.  LESSEE shall pay any
         increases in real property taxes occasioned by such altera-
         tions or additions.

SHOPPING    30.  LESSOR further covenants upon any construction of
CENTER   other buildings in the shopping center, within the area
OCCUPANCY designated for such buildings as denoted on Exhibit "A", that

Page 36
Lease Agreement

such construction shall not impede the customer traffic flow nor impede access to and from the LESSEE'S delivery and service areas to LESSEE'S premises or the area cross hatched on Exhibit "A" during the construction of the balance of the shopping center.

LESSOR agrees, on the real estate of which the premises are a part, that the LESSOR now controls or on contiguous or adjacent real estate the LESSOR may at some later date control, that there will not be located on such real estate, a theatre, bowling alley, restaurant, or skating rink within three hundred (300) feet of the front door to the premises, and further no offices, training or educational facilities within two hundred (200) feet of the front door to the premises.

**RIGHT TO**
**CLOSE**
**STORE**

31.  LESSOR agrees that nothing in this lease shall be construed as compelling LESSEE to operate any particular type of business or to keep the store in or upon the premises open for business, and LESSEE shall have the privilege of closing said store at any time, provided LESSEE shall continue to pay the minimum monthly rental and all other costs as set forth in this lease.

**PERMANENT**
**CLOSURE**

In the event that LESSEE permanently closes the store, then LESSEE agrees to promptly notify LESSOR in writing of its intent.  LESSOR shall have sixty (60) days from its receipt of such notice in which to notify LESSEE of its intent to terminate the lease, or sublet the premises.  LESSOR may also, at its election, extend sixty (60) day period for an additional sixty (60) days, in which event LESSOR shall notify LESSEE in writing of its election, and LESSEE shall not be liable for

Page 37
Lease Agreement

any rental payments to LESSOR attributable to such additional sixty (60) day period. If LESSOR elects to terminate this lease, then such termination shall be effective as of the date of LESSOR'S mailing to LESSEE of its notice of termination. If LESSOR does not terminate this lease or sublease the premises, or if LESSOR fails to notify LESSEE of its intention to terminate this lease or to sublease the premises, within the above-described periods, then LESSEE may sublet the premises in accord with the provisions set forth in Paragraph 32. After said sixty (60) or one hundred twenty (120) day periods, LESSOR shall have the continuing right to sublet the premises, so long as LESSEE has not entered into a prior sublease agreement. At any time that LESSOR subleases the premises pursuant to the provisions of this Paragraph, this lease shall immediately terminate and neither LESSOR or LESSEE shall have any further rights or obligations hereunder.

LESSOR may not terminate this lease if LESSEE has temporarily closed the store, as defined hereinafter; provided LESSEE shall continue to pay the minimum monthly rental and comply with all other covenants of the lease. Temporary closing of the store shall mean any closing for the following purpose or reasons:

a. The discontinuance of business at the store by any sublessee or assignee of LESSEE, provided, however; LESSEE is with due diligence attempting to secure another sublessee or assignee.

b. Damage or destruction pursuant to Article 15 of the Lease.

c. Condemnation pursuant to Paragraphs 17 and 18 of the Lease.

d. Refixturing of the premises, provided same be undertaken with due diligence.

Page 38
Lease Agreement

e-lusive given to minor tenants only where LESSEE has given its prior consent to such exclusives.

LESSEE shall be permitted to sublease the premises for any lawful purpose permitted under the zoning governmental rules, regulations and ordinances then in effect. LESSEE covenants and agrees that the premises shall not be used for an entertainment center, movie theater, a cocktail lounge, books and materials of solely prurient interest and without any redeeming social value.

**LESSOR'S WAIVER**

33. LESSOR agrees that none of the property, including food, supplies, merchandise, inventory, furniture, fixtures, machinery, equipment, cash or any proceeds therefrom that are placed upon or permitted to be upon the premises by LESSEE, or any of LESSEE'S sub-tenants, assigns, or successors, during the term of this lease or any renewal thereof, shall be subject to or liable for levy or distress or any legal process whatsoever for the collection of rent for the premises. In the event there is a mortgage on the premises, the LESSOR shall obtain the same waiver from the mortgagee.

**NOTICES**

34. Any notice required or desired to be given to either party shall be in writing and be sent by registered mail, postage prepaid. Any such notice to the LESSOR shall be addressed to it at 254 Sutter Street, 6th Floor, San Francisco, California 94108. Any such notice to the LESSEE shall be addressed to it at P. O. Box 1160, Topeka, Kansas 66601. The address of either party may be changed by written notice thereof to the other party.

**CAPTIONS**

35. Any headings preceding the text of the several paragraphs and sub-paragraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this lease, nor shall they affect its meaning, construction or effect.

Page 40
Lease Agreement

ADVANCE
POSSES-
SION FOR
FIXTURE
INSTALL-
ATION

36.    LESSEE shall have the privilege rent free of entering the premises for the purpose of installing its store and trade fixtures, storing its first items of equipment and otherwise preparing the premises for LESSEE'S occupancy prior to the rent commencement date.

When the performance of the LESSOR'S work has proceeded to the point where LESSEE can commence any portion of its work and the installation of LESSEE'S trade fixtures, furniture and equipment in the premises, in accordance with good construction practice together with adequate security of the premises be commenced, LESSOR shall notify LESSEE to that effect. LESSEE agrees to install its trade fixtures and equipment in the premises in a prompt and expeditious manner so as not to delay LESSOR in readying the premises for occupancy at the earliest possible date referred to hereinabove.    LESSEE further agrees not to engage any persons in the installation of such fixtures and equipment which would result in a work stoppage by employees of the general contractor or any subcontractor engaged readying the premises for occupancy.

37.    LESSEE agrees that this lease shall be subordinate to any mortgage that may hereafter be placed upon the premises and to all renewals and extensions thereof to which LESSEE has given its written consent to be subordinate; pro-

SUBORDIN-
ATION

vided that (a) the mortgagee named in such mortgages shall agree to recognize this lease in the event of foreclosure if the LESSEE is not then in default, (b) in the event the premises are damaged or destroyed at a time when neither LESSOR nor LESSEE are in default under the terms of this lease, and LESSOR is not in default under the terms of any such mortgages, any insurance proceeds that are available under the insurance policy(s) hereinabove required to be maintained under Paragraph 16 are first applied to repair, replace

Page 41
Lease Agreement

or rebuild the premises so damaged or destroyed, if LESSOR
and/or LESSEE under the terms of Paragraph 17 above, either
are required to elect to repair, replace or rebuild the
premises, and (c) any proceeds from condemnation awarded to
LESSEE and/or its sublessee under Paragraph 17 and Paragraph
18 above shall be the sole property of LESSEE and/or its
sublessee.

BINDING
EFFECT
    38.   This agreement shall be binding upon, and shall
inure to the benefit of the parties hereto, their heirs,
executors, administrators, successors and assigns.

MERGER
    39.   This agreement contains the entire agreement of the
parties hereto, both written and oral, and shall not be
amended, altered or otherwise modified except in writing
signed by the parties.

TIME
    40.   Time is of the essence in the performance of all
obligations of LESSOR and LESSEE hereunder for which a time of
performance is specified.

CHOICE
OF LAWS.
    41.   This agreement shall be construed under and in
accordance with the laws of the State of California, and all
obligations of the parties created hereunder are performable
in Sonoma County, California.

COMPLI-
ANCE WITH
LAWS AND
ORDIN-
ANCES
    42.   LESSEE shall, at its expense, comply with all laws,
orders, ordinances and regulations of federal, state, county
and municipal authorities and with the direction made pursuant
to law of any public officer or officers which shall, with
respect to the occupancy or use of the demised premises impose
any violation, order, or duty upon LESSOR or LESSEE arising
from LESSEE'S occupancy, use or manner of use of the demised
premises or any installations made therein by or at LESSEE'S
request or required by reason of a breach of any of LESSEE'S
covenants or agreements herein, including its obligations to
make certain repairs hereunder.

Page 42
Lease Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this lease as of the date and year first above written.

LESSOR –

GREAT WESTERN OUTLET PARTNERS,
A California Limited Partnership

BY _____
        General Partner

LESSEE-

FLEMING COMPANIES, INC.

BY _____
        Vice President

(SEAL)

ATTEST:
_____
Assistant Secretary

Page 46
Lease Agreement

**EXHIBIT B**



86011737

RECORDED AT THE REQUEST OF,
AND WHEN RECORDED PLEASE MAIL TO:

James Blythe Hodge
SHEPPARD, MULLIN, RICHTER & HAMPTON
Four Embarcadero Center, Suite 1700
San Francisco, California 94111

Recorded At Request Of
NO. BAY T CO.
at ___ Past ___ M.
FEB 20 1986
DONALD McKENZIE
SONOMA COUNTY CALIF.

AGREEMENT AND GRANT
OF
RECIPROCAL EASEMENTS

W3S14/cn

RECEIVED
JAN 30 1986



86C11737

AGREEMENT AND GRANT
OF
RECIPROCAL EASEMENTS

I.  RECITALS

A.  Property........................................... 1
B.  Purpose............................................ 1
C.  Lessees............................................ 1

II.  DECLARATION

III.  TERMS

1.  Building/Common Areas – Definition............. 2
    1.01  Building Areas........................... 2
    1.02  Common Areas............................. 2
    1.03  Automobile Parking Area.................. 3

2.  Buildings...................................... 3
    2.01  Use...................................... 3
          2.01.1  Restrictions..................... 3
          2.01.2  Lessee Rights.................... 4
    2.02  Location................................. 4
          2.02.1  Building Areas................... 4
          2.02.2  Encroachment..................... 4
          2.02.3  Appurtenances.................... 4
    2.03  Design and Construction.................. 5
    2.04  Fire Protection.......................... 5

3.  Common Areas Use............................... 6
    3.01  Use...................................... 6
    3.02  Limitations on Use....................... 6
          3.02.1  Customers........................ 6
          3.02.2  Employees........................ 6
          3.02.3  General.......................... 6
    3.03  Utility and Service Easements............ 6
    3.04  Building Separation and Fire
          Separation Easements..................... 7

4.  Easements...................................... 7
    4.01  Definitions and Documentation............ 7
          4.01.1  Benefit.......................... 7
          4.01.2  Context.......................... 7

i

WBS14/m

66011737

|  |  | 4.01.3 | Servient Tenement | 7 |
|  |  | 4.01.4 | Dominant Tenement | 7 |
|  |  | 4.01.5 | Nonexclusive; Irrevocable | 8 |
|  |  | 4.01.6 | Confirmation | 8 |
|  |  | 4.01.7 | Easement Appurtenant | 8 |
|  | 4.02 |  | Nonexclusive Easements for Automobile Parking and Incidental Uses | 8 |
|  | 4.03 |  | Exclusive Easement for Parcel 2 and 3 | 9 |
|  | 4.04 |  | Easements in Perpetuity | 9 |
|  | 4.05 |  | Common Area Maintenance | 9 |
| 5. | Common Areas – Development, Maintenance and Taxes | | | 9 |
|  | 5.01 |  | Development | 9 |
|  |  | 5.01.1 | Arrangement | 9 |
|  |  | 5.01.2 | Development Timing | 9 |
|  | 5.02 |  | Maintenance | 9 |
|  |  | 5.02.1 | Maintenance Director and Standards | 9 |
|  |  | 5.02.2 | Limitation on Authority | 10 |
|  |  | 5.02.3 | Expenses | 11 |
|  |  | 5.02.4 | Termination or Resignation of Maintenance Director | 11 |
|  |  | 5.02.5 | Owners' Responsibility for Building Maintenance | 11 |
|  | 5.03 |  | Taxes | 12 |
|  | 5.04 |  | Right of City to Compel Maintenance of Common Areas | 12 |
|  |  | 5.04.1 | City May Compel Performance | 12 |
|  |  | 5.04.2 | Costs of Enforcement | 12 |
|  |  | 5.04.3 | Waiver | 13 |
|  |  | 5.04.4 | Mortgage Protection | 13 |
|  | 5.05 |  | Indemnification of City | 13 |
| 6. | Signs | | | 14 |
| 7. | Indemnification/Insurance | | | 14 |
|  | 7.01 |  | Indemnification | 14 |
|  | 7.02 |  | Insurance | 14 |
| 8. | Eminent Domain | | | 15 |
|  | 8.01 |  | Parcel Owner's Right to Award | 15 |
|  | 8.02 |  | Collateral Claims | 15 |
|  | 8.03 |  | Lessee's Claim | 15 |

ii

WBS14/m

860:1737

9.     Agreement.................................. 15
       9.01    Modification - Cancellation............. 15
       9.02    Breach................................ 16

10.    Rights and Obligations of Lenders............ 16

11.    Rights of Successors......................... 16

12.    Consents................................... 16

13.    Headings................................... 16

14.    Severability............................... 16

15.    Not a Public Dedication...................... 16

16.    Remedies................................... 17
       16.01   General.............................. 17
       16.02   Lien................................. 17
               16.02.1  Name........................ 17
               16.02.2  Basis of Claim.............. 17
               16.02.3  Address..................... 17
               16.02.4  Description................. 17
               16.02.5  Amount...................... 17
               16.02.6  Authority................... 18

iii

WBS14/m

85011737

## AGREEMENT AND GRANT
### OF
### RECIPROCAL EASEMENTS

This Agreement is made as of January 22, 1986, by and between Great Western Outlet Partners, a California limited partnership ("Declarant") and any and all subsequent owners of any part of the property described below.

## I. R E C I T A L S

A. **Property.** Declarant owns the real property (the "Property") shown on the plan attached hereto as Exhibit A, and which is more fully described on Exhibit B attached hereto. The Property is divided into four parcels (the "Parcels") numbered 1, 2, 3 and 4, as shown on Exhibit A. Parcel 4 is further divided into three retail sites designated as Site A, B and C as shown on Exhibit A. Parcel 3 is sometimes hereinafter called the "Taco Bell Parcel". Parcel 2 is sometimes hereinafter called the "Burger King Parcel".

B. **Purpose.** Declarant intends that the Property be developed as an integrated retail sales complex (the "Shopping Center") for the mutual benefit of all the Parcels. Declarant desires to subject the Shopping Center and the Property to a common plan of agreements for the benefit and protection of Declarant and its successors, grantees and assignees, including, but not limited to, the grantees of each of the Parcels. Declarant also desires to provide for easements appurtenant to the Parcels for the benefit of such Parcels. It is the intention of Declarant that both the benefit and burden of the agreements contained herein shall run with the land, and that they shall also constitute equitable servitudes enforceable by and against Declarant's successors, grantees and assignees. The easements provided for herein shall burden the opposite servient tenements and benefit the opposite dominant tenements and such benefits and burdens shall run with the land and be enforceable by the owners of the opposite dominant tenements and their successors, grantees and assignees against the owners of the opposite servient tenements and their successors, grantees and assignees.

C. **Lessees.** Declarant has entered into the following leases (the "Leases"): (1) THE HOME CLUB, INC., a California corporation ("Home Club"), dated June 29, 1984, with an initial term of twenty (20) years, for approximately 80,000 square feet; (2) FLEMING COMPANIES, INC., an Oklahoma corporation ("Fleming"), dated June 18, 1984, with an initial term of twenty (20) years, for approximately 54,601 square feet; and (3) THRIFTY CORPORATION ("Thrifty"), dated May 23, 1985, with an initial term of twenty-five (25) years, for approximately

KBS147/m                    -1-



39,120 square feet. Home Club, Fleming and Thrifty shall be referred to herein as Lessees.

## II. DECLARATION

NOW, THEREFORE, Declarant hereby establishes the following general plan for the protection and benefit of the Shopping Center and hereby declares that the Shopping Center and the Parcels shall be held, conveyed, transferred, sold, encumbered, used, occupied and improved subject to the following agreements, all of which are in furtherance of a general plan for the Shopping Center. All of the agreements set forth herein shall run with the Property and shall be binding on all parties having or acquiring any right, title or interest therein or thereto or any part thereof and shall be for the benefit of and binding upon each of Declarant's successors, grantees and assignees in the Property. Each successive owner of a Parcel during such person's ownership of such Parcel, and each owner having any interest in any portion of the Property is bound hereby for the benefit of the successive owners of the other Parcels, during such person's ownership of such other Parcel.

## III. TERMS

1. **Building/Common Areas - Definition.**

1.01 Building Areas. The term "Building Areas" shall mean those portions of Parcels 1 and 4 as are shown on the plan attached hereto as Exhibit A and those portions of Parcels 2 and 3 upon which the owners shall build, with the written consent of the owners of Parcels 1 and 4 and Lessees which consent shall not be unreasonably withheld; provided, however, that with the written consent of the owners of Parcels 1 and 4 and Lessees, an owner of a Parcel may from time to time change the size and location of the Building Areas on that Parcel by recording an amendment to this Agreement in the Office of the Recorder of Sonoma County, California. A decision to grant or withhold a consent as in this Paragraph, or any other Paragraph of this Agreement shall not involve monetary consideration or be unreasonably delayed.

1.02 Common Areas. The term "Common Areas" shall mean those portions of Parcels 1 and 4 shown as Common Areas on the plan attached as Exhibit A and those portions of Parcels 2 and 3 which the owners of those Parcels shall designate as common areas (the "Common Areas"), subject to the written consent of the

WB514/m                              -2-

86611737

CAM
-4

E



86011737

owners of Parcels 1 and 4. The Common Areas shall include portions of Building Areas which at any time are not actually improved or covered by a building or otherwise used by the owner of such Parcel. Common Areas include, without limitation, pedestrian walkways and patios, stairways, decorative walks, plazas, malls, throughways, loading areas, parking areas and roads. The owner of a Parcel may, with the written consent of the owners of Parcels 1 and 4 and Lessees, from time to time change the size, location and arrangement of the Common Areas on that Parcel by recording an amendment to this Agreement in the Office of the Recorder of Sonoma County, California.

    1.03 **Automobile Parking Area.** The term "Automobile Parking Area" shall mean those portions of each Parcel used from time to time for the passage and parking of motor vehicles, together with all improvements which at any time are erected thereon, including the incidental and interior roadways, bicycle paths, light standards, directional signs, access roads and driveways within or adjacent to areas used for parking of motor vehicles.

    2.   **Buildings.**

    2.01  **Use.**

        2.01.1 **Restrictions.** All buildings, structures and other areas within the Shopping Center shall be used for commercial purposes of the type usually found in retail shopping centers. All tenants occupying the buildings and structures within the Shopping Center shall be primarily retail and service tenants of the type normally associated with a retail shopping center. In no event shall the buildings, structures, or common areas be used for a theater, skating rink, office, training or education facility, school, bowling alley, car wash, pornographic bookstore, or primarily as a warehouse or other business whose primary purpose is entertainment, amusement or recreation. Nor shall any building, structure or common area be used as a restaurant within 300 feet of the front entrance to a building located on Parcel 4, Site A without the written consent of the owner of Parcel 4. In addition, Parcels 2 and 3 shall not be used without the written consent of the owners of Parcels 1 and 4 for (1) sale of gasoline, (2) motor vehicle repair, or (3) sale of groceries, beer or wine by means of a convenience store. No building other than that constructed on Parcel 4, Site A shall be used as a retail grocery food store except with the consent of the owner of Parcel 4. In addition, no building other than that constructed on Parcel 4, Site B shall be used for handling and selling patent and other medicines and drugs, or the handling and selling of any and all items of merchandise which under any law,

WRS14/z              -3-

E6C11737 

rule, regulation or order promulgated by a competent governmental authority must be sold by, or in the presence of, a registered pharmacist. No buildings other than those constructed on Parcel 4, Sites A and B shall be used for the sale of wines and liquors for off premises consumption.

2.02.2 **Lessee Rights.** Declarant has granted to one or more Lessees under the terms of the Leases, rights co-extensive with the rights granted to or reserved by the owner of Parcel 4 pursuant to the terms of this Agreement. To the extent that a Lessee has been granted such rights under its Lease, that Lessee may enforce those rights directly and independently against any Parcel owner. The rights granted to or reserved by the owner of Parcel 4 shall be deemed granted or reserved for the benefit of the Lessee to the extent that co-extensive rights have been granted to that Lessee under its Lease, and the Lessee, for purposes of enforcing its rights under its Lease and this Agreement, shall be deemed a party hereto. No provision of this Agreement shall impair any of the Lessee's rights under the Leases, nor diminish Declarant's obligations to Lessees under the Leases, including the obtaining of any required Lessee consent. Lessee's rights under this Agreement shall exist only so long as the Lease between Declarant and the Lessee, or their respective successor in interest, is not in default thereunder.

2.02 **Location.**

2.02.1 **Building Areas.** Except as may be allowed under Subparagraphs 2.02.2 and 2.02.3 below, no building or structure shall be constructed within the Shopping Center except within the Building Areas.

2.02.2 **Encroachments.** Canopies, roof overhangs, roof overhang supporting columns and pillars, normal foundations and/or doors may project from any building or structure a distance not to exceed eight (8) feet outside the Building Areas so long as any such projections do not interfere with normal pedestrian and/or vehicular traffic circulation within the Shopping Center.

2.02.3 **Appurtenances.** Pylon and directional signs, bumper guards or curbs, landscape planters, lighting standards, and any material landscaping improvements or modifications which may be required under applicable governmental laws, ordinances or regulations may be placed, constructed or located outside the Building Areas, with the prior written approval of the owners of Parcels 1 and 4, which approval shall not be unreasonably withheld.

WBS14/m                                    -4-



2.03  Design and Construction.  The design and
construction of all buildings and structures within the Shopping
Center shall be in conformity with sound architectural and
engineering standards, and the construction shall be of first
quality.  No building within the Shopping Center shall exceed one
story in height (25 feet from ground level).  Construction on
Parcels 2 and 3 shall not exceed a total of 4,000 square feet of
floor area per lot.  Floor area shall include mezzanines, if
permitted, but shall exclude rooftop areas, building canopies,
pilasters, overhang and recessed building openings.  The exterior
design, color and elevations of all buildings in the Shopping
Center must be approved in writing by the owners of Parcels 1 and
4 and Lessees.  Prior to construction of any new building or
buildings within the Shopping Center, and prior to any exterior
changes, alterations or modifications of any existing building or
buildings, any person who desires to construct such building or
buildings or make such exterior changes, alterations or modi-
fications shall submit to the owners of Parcels 1 and 4 and
Lessees its proposed plans, specifications, drawings and other
pertinent information necessary for the owners of Parcels 1 and 4
and Lessees to review adequately the exterior design, color and
elevations that are proposed and thereupon either approve or
disapprove of the same.  Approval shall not be unreasonably
withheld.  If approval or disapproval of any such plans and
specifications (as accompanied by the pertinent information and
drawings) is not given within twenty (20) days from receipt
thereof, the owners of Parcels 1 and 4 and Lessees shall be
deemed to have approved such plans and specifications.  If the
owner of either Parcel 1 or 4 and Lessee rejects or disapproves
such plans and specifications, then such person must provide a
written explanation in reasonable detail within that 20-day
period of its reasons for disapproval.  If any plans and
specifications of any person are disapproved as provided herein,
then such person may submit alternate proposed plans and
specifications, which alternate proposal shall be handled in the
same manner as the initial proposal.  Construction shall not
impede customer traffic flow or access to any Parcel.

2.04  Fire Protection.  Every building and structure
within the Shopping Center shall be either equipped with such
automatic sprinkler systems as meet all of the standards of the
Insurance Services Office (or other similar local organization
having jurisdiction) or shall be constructed in such a manner as
not to affect adversely the fire rating of any building or
structure built upon any other Parcel in the Shopping Center.
The purpose of this Paragraph is to allow the buildings and
structures on each Parcel to be rated separately and distinctly
for fire insurance purposes without deficiency charge.

WBS14/m                          -5-



3.    Common Areas Use.

3.01  Use.  Subject to existing easements of record, the Common Areas shall be used solely for roadways, walkways, ingress and egress, parking of motor vehicles, loading and unloading of commercial and other vehicles, for driveway purposes, landscaping and landscape planters and for the comfort and convenience of lessees, customers, invitees, contractors and employees of all businesses and occupants of the buildings constructed on the Building Areas, and all lessees, customers, invitees, contractors and employees of all businesses and occupants of the buildings constructed on the Building Areas shall be allowed to use all the Common Areas in accordance with this Agreement.

3.02  Limitations on Use.

3.02.1  Customers.  Customers and invitees shall not be permitted to park on the Common Areas except while shopping or transacting business within the Shopping Center.

3.02.2  Employees.  Employees shall not be permitted to park on the Common Areas, but may be restricted to those portions thereof as the owners of Parcels 1 and 4 may, in a uniform and nondiscriminating fashion, designate as "employee parking areas".

3.02.3  General.  All of the uses permitted within the Common Areas shall be exercised with reason and judgment so as not to interfere with the primary purpose of the Common Areas, which is to provide for parking for the customers, invitees, employees and contractors of those businesses conducted within the Building Areas and for the servicing and supplying of such businesses.  The owner of Parcel 4 may establish and enforce reasonable rules and regulations concerning the maintenance, management, use and operation of the Common Areas, provided that thirty (30) days notice is provided to the owners of all Parcels and all lessees, and such rules and regulations are, nondiscriminatory and to the extent applicable, binding on and enforced against all Parcels equally.

3.03  Utility and Service Easements.  The owners of the Parcels shall grant appropriate and proper easements for the installation, repair and replacement of storm drains, sewers, utilities and other proper services necessary for the orderly development and operation of the Common Areas and buildings to be erected upon the Building Areas at such locations and along such routes as the owners of the Parcels affected shall approve.  Such approval shall not be unreasonably withheld.  It shall not be

WBS14/m                                -6-



86C11737

unreasonable for a Parcel owner to disapprove of a location of an
easement which would run through that Parcel owner's Building
Area. Parcel owners and their agents and employees shall use
reasonable care to complete such installation, repair and
replacement with minimal disruption to existing business
operations.

3.04 Building Separation and Fire Separation Easements.
The owner of Parcel 1 shall grant and hereby grants to the owner
of Parcel 4 a Building and Fire Separation Easement, as shown on
Exhibit A. There shall be no structures constructed within the
boundaries of this easement. The owner of Parcel 4 shall grant
and hereby grants to the owner of Parcel 1 a Building and Fire
Separation Easement, as shown on Exhibit A. There shall be no
structures constructed within the boundaries of this easement.
These easements shall not be revoked unless such revocation is
first approved by the City of Santa Rosa.

4.    Easements.

4.01  Definitions and Documentation. This Section 4
grants the easements and sets forth the terms and conditions
thereof, which the respective Parties hereby grant to each other,
for the respective periods set forth with respect to each such
easement. For the purposes of this Section 4, the following
shall apply:

4.01.1  Benefit. The easements granted herein
shall benefit only the Parcels. The owner of a Parcel may permit
and designate, from time to time, its agents, employees,
licensees, permittees and invitees to use such easements,
provided that no such permission shall authorize a use of an
easement in excess of the use intended at the date of this
Agreement.

4.01.2  Context. The word "in" with respect to an
easement granted "in" a particular Parcel means, as the context
may require, "in", "to", "on", "over", "through", "upon",
"across" and "under", or any one or more of the foregoing.

4.01.3  Servient Tenement. If an easement binds
and burdens a Parcel, that Parcel shall, for the purpose of this
Agreement, be deemed to be the servient tenement (where only a
portion of the Parcel is bound and burdened by the easement, only
that portion shall be deemed to be the servient tenement).

4.01.4  Dominant Tenement. If an easement
benefits a Parcel, that Parcel shall, for the purpose of this
Agreement, be deemed to be the dominant tenement (where only a

WBS14/m                                -7-



56C11737

portion of the Parcel is so benefited, only that portion shall be deemed to be the dominant tenement). All easements granted herein shall be presumed, unless a contrary intent is expressed, to benefit all of the Parcels.

4.01.5  Nonexclusive; Irrevocable.  Unless provided otherwise, all easements granted herein are nonexclusive and irrevocable.

4.01.6  Confirmation.  All easements established herein shall exist by virtue of this Agreement, without the necessity of confirmation by any other document, subject to the approvals required in Paragraph 3.03.  However, upon the request of any other owner of a Parcel, each owner of a Parcel will sign and acknowledge a document memorializing the existence (including the location and any conditions), as the case may be, of any easement, if the form and substance of the document are approved by each owner of a Parcel, which approval shall not be unreasonably withheld.

4.01.7  Easement Appurtenant.  All easements granted herein shall be easements appurtenant and not easements in gross.

4.02  Nonexclusive Easements for Automobile Parking and Incidental Uses.  Each Parcel shall have nonexclusive easements (1) over the Automobile Parking Area of each other Parcel, for ingress to and egress from the dominant Parcels and accommodation of pedestrians, and (2) over the Automobile Parking Area of each Parcel for the passage and parking of vehicles.  All use of a Parcel shall, for purposes of determining prescriptive rights on the Property or dedication to public use, be deemed by permission of the owner of that Parcel.  The recordation of this Agreement shall be deemed notification to the public that the following is hereby recorded pursuant to Section 813 of the California Civil Code:

> "The right of the public or any person to make any use whatsoever of the herein described land or any portion thereof (other than any use expressly allowed by a written or recorded map, agreement, deed or dedication) is by permission, subject to control, of owners: Section 813, Civil Code."

The owner of each Parcel shall have the right to eject or cause the ejection from the Common Areas of its Parcel of any person not authorized, empowered or privileged to use the Common Areas of such Parcel.

WBS14/m                        -8-

B5C11737

4.03 **Exclusive Easement for Parcel 2 and 3.** The owners of Parcel 2 and 3 shall have and are hereby granted exclusive easements, twenty (20) feet in width along the western boundary of their Parcels which easements are more particularly described on Exhibit A. The use of these easements shall not unduly interfere with other easements granted in this Agreement.

4.04 **Easements in Perpetuity.** The easements granted by this Agreement shall be perpetual and shall survive the termination of any other agreements between or among the owners of any Parcel.

4.05 **Common Area Maintenance.** If the owner of Parcel 1 does not designate a Maintenance Director as defined and provided by Paragraph 5.02.1, then the owner of each Parcel shall operate and maintain, or cause to be operated and maintained, the completed portions of its Common Area on the Parcel of such owner, in good order, condition and repair.

5. **Common Areas - Development, Maintenance and Taxes.**

5.01 **Development.**

5.01.1 **Arrangement.** Except as provided in Section 1, the arrangement of the Common Areas as shown on Exhibit A attached hereto, including without limitation the location of driveways, parking and landscaped areas, shall not be changed except by written approval of the Parcel owners and Lessees.

5.01.2 **Development Timing.** When any building is constructed within the Building Areas on a Parcel, all the Common Areas on that Parcel shall be fully developed in the manner approved by the owner of Parcels 1 and 4 at the expense of the owner of such Parcel.

5.02 **Maintenance.**

5.02.1 **Maintenance Director and Standards.** The owner of Parcel 1 shall designate a Maintenance Director for the Shopping Center. The Maintenance Director shall maintain the Common Areas of Parcels 1, 2, 3 and 4 in good condition and repair. The Maintenance Director may receive for such services a fee (the "Administration Fee") of up to ten percent (10%) of total annual maintenance expenses. The owners of Parcels 1 and 4 shall approve all maintenance expenses, but may delegate all or a portion of that

WBS14/m                    -9-



authority to the Maintenance Director.  The maintenance to
be performed upon the Common Areas of the Parcels by the
Maintenance Director is to include, but not be limited to,
the following:

(i)  Maintaining the surfaces of the
Common Areas on all Parcels in a level, smooth and evenly
covered condition with the type of surfacing material
originally installed or such substitute as shall in all
respects be equal in quality, use and durability;

(ii)  Removing all papers, debris, filth
and refuse from and thoroughly sweeping the Common Areas to
the extent reasonably necessary to keep the Common Areas in
a clean and orderly condition;

(iii)  Placing, keeping in repair and
replacing any necessary and appropriate directional signs,
markers and lines;

(iv)  Operating, keeping in repair and
replacing, where necessary, such artificial lighting facili-
ties as shall be reasonably required for safety and crime
prevention;

(v)  Maintaining all perimeter walls of
the Shopping Center and all utility lines (except lateral
lines servicing individual buildings) and Common Area
facilities and equipment in good condition and state of
repair; and

(vi)  Maintaining all landscaped areas
and landscaping facilities and equipment installed in the
Common Areas and making such replacements of shrubs and
other landscaping as is necessary to maintain the
landscaping in a thriving condition.

5.02.2  Limitation on Authority.  The owners
of Parcels 1 and 4 shall approve all maintenance expenses
but may delegate all or a portion of that authority to the
Maintenance Director.  In performing its obligations, the
Maintenance Director shall have no authority to incur any
liability or expense for an item or service normally
regarded as a capital expenditure under generally accepted
accounting principles or which exceeds Two Thousand Dollars
($2,000) without the prior written approval of the owners of
each Parcel.

WBS14/m                              -10-

85011737

5.02.3 <u>Expenses</u>. Within thirty (30) days of the end of each calendar quarter, the Maintenance Director shall send a statement (the "Operating Statement") to the owners of each Parcel (or such other person or entity as any such owner may designate in writing to the Maintenance Director) of each such Parcel's pro rata share of the preceding quarter's expenses for Common Area maintenance services described in Subparagraph 5.02.2 above (including its pro rata share of the administration fee). Each Operating Statement shall itemize the expenses incurred for the Common Area maintenance services covered by the Operating Statement. Each owner shall pay its share of the Common Area maintenance expenses within thirty (30) days of the date of each such Operating Statement. The pro rata share of Common Area maintenance expenses to be paid by each Parcel's owner shall be a fraction of such expenses, the numerator of which shall be the total square footage of such Parcel and the denominator of which shall be the total square footage of all Parcels. Within twelve (12) months of receipt of an Operating Statement, each Parcel owner, or its authorized representative, shall have the right, upon thirty (30) days written notice to the Maintenance Director, to audit the Operating Statement and to examine the Maintenance Director's books of accounts or other records relating to the Common Area expenses for the calendar year covered thereby. The Maintenance Director shall make all such records available for such examination at its principal offices. The Parcel owner requesting the audit or review shall bear all costs associated with that audit or review.

5.02.4 <u>Termination or Resignation of Maintenance Director</u>. If the Parcel owners are dissatisfied with the method or cost of maintenance of the Common Areas by the Maintenance Director, they may, upon mutual agreement of all such owners and upon thirty (30) days written notice to the Maintenance Director, cancel the Maintenance Director's obligation to maintain all of the Common Areas. In that case, the owner of Parcel 1 and 4 shall appoint a replacement Maintenance Director.

5.02.5 <u>Owners' Responsibility for Building Maintenance</u>. Each Parcel owner shall be responsible for all maintenance and repair to buildings and other structures and, in the absence of a Maintenance Director, the Common Areas on its own Parcel or Parcels. All such buildings and structures and Common Areas shall be maintained in good condition and repair.

WBS14/m                    -11-



06011787

5.03  Taxes.  Each Parcel owner hereby agrees to pay or cause to be paid, prior to delinquency, directly to the appropriate taxing authority, all real property taxes and assessments which are levied against its Parcel or Parcels (including the Common Areas thereon).

5.04  Right of City to Compel Maintenance of Common Areas.  In consideration of the approval by the City of Santa Rosa ("City") of the development of the Property, Declarant covenants and agrees and each owner of any Parcel by the acceptance of any deed thereto, whether or not this Agreement is expressed in that deed, and all heirs, executors, administrators, assigns, and successors in interest of each Parcel owner is deemed to covenant and agree as follows:

5.04.1  City May Compel Performance.  If the Maintenance Director or an owner of the Parcel affected if there is no Maintenance Director fails to maintain the Common Area at all times in a neat, clean and well-kept appearance, the City shall have the right, but not the duty, to compel such maintenance in the manner hereinafter provided.

After due notice and a public hearing, the City Council shall authorize and direct the giving of sixty (60) days written notice to the Maintenance Director or the owner of the Parcel affected if there is no Maintenance Director to correct such failure to maintain the Common Area.  If the Maintenance Director or an owner of the Parcel affected if there is no Maintenance Director fails to take steps reasonably satisfactory to the City to correct such failure within that sixty (60) day period, the City shall have the right to do any of the following:

(i)  Do or perform any act the Maintenance Director or an owner of the Parcel affected if there is no Maintenance Director is authorized to do or perform under this Agreement which shall be necessary to maintain the Common Area including, but not limited to, the performance of the necessary maintenance, the levy and collection of the cost of doing such maintenance in accordance with Paragraph 5.02.3 above and the pursuit of such legal steps as may be necessary to compel performance.

5.04.2  Costs of Enforcement.  If the City exercises any of the remedies afforded to it under Paragraph 5.04.1 above, any sums recovered from any suit or foreclosure sale or judicial foreclosure proceedings shall

WBS14/m                         -12-



86011737

be applied first to cover the City's costs of suit or
foreclosure, including but not limited to filing fees, title
company charges, miscellaneous foreclosure costs, and
reasonable attorneys' fees.  The balance of any sums so
recovered shall then be applied against any amount which is
then lawfully owing to the City or other public entities.
All remaining sums shall be paid to the owner of the Parcel
foreclosed as its interest may appear.

    5.04.3  Waiver.  Failure of the City to enforce
any covenant or restriction shall not be deemed a waiver of
the right to do so thereafter.

    5.04.4  Mortgage Protection.  Notwithstanding any
provision of this Agreement to the contrary, any lien
created by the City upon a Parcel shall be subject and
subordinate to, and shall not affect the rights of, a holder
of an indebtedness secured by any mortgage or deed of trust
upon such Parcel made in good faith and for value; provided
that the mortgage or deed of trust has been recorded prior
to the recording of a notice of delinquency by the City.  No
foreclosure of any such mortgage or deed of trust shall
impair the City's right to enforce the provisions of this
Paragraph 5.04 against the purchaser of such Parcel at such
foreclosure sale as to existing or future failures to
maintain the Common Area.

    5.05  Indemnification of City.  In consideration
of and as a condition of approval of the development of the
Property, Declarant, on behalf of itself and its successors
and assigns and each Parcel owner, releases, discharges,
holds and saves harmless the City, its officers and
employees from any and all liability, claims, or demands
arising out of the inadequate or negligent maintenance of
the Common Areas, excepting the City's gross negligence or
wilful conduct.

    Should the City be joined or named as a party in
any legal proceedings or in any other action related to the
maintenance responsibilities of the Common Areas covered by
this indemnification, Declarant, its successors and assigns
and each Parcel owner shall indemnify, hold harmless, and
defend or settle any and all claims or actions against the
City and to pay any and all claims, damages, judgments, or
other liability legally imposed upon the City arising out of
any such proceedings and shall pay all costs and expenses,
including attorneys fees and reasonable defense costs
incurred in connection therewith.

WBS:4/m                        -13-



56011737

6.  **Signs.**  Subject to any necessary governmental approvals and approval of the owners of Parcels 1 and 4, which approval shall not be unreasonably withheld, one sign tower may be built at the location shown on Exhibit A.  The sign shall be used exclusively for Lessees.  One monument sign may be located on Parcels 2 and 3.  In no event shall any sign impair the visibility of or access to the Shopping Center.  After the initial installation of each such sign, no changes in such sign shall be made (other than maintenance, repair or replacement) without the approval of all owners of Parcels 1 and 4, which approval shall not be unreasonably withheld.  The cost of erecting and maintaining each sign shall be borne by the owner of the Parcel upon which it is erected.  No other sign shall be erected or maintained upon the Common Areas on any Parcel except for directional signs for guidance upon the parking and driveway areas which may be erected with the prior written approval of the Maintenance Director as to size, design, appearance and location, applying consistent standards throughout the Shopping Center.

7.  **Indemnification/Insurance.**

7.01  **Indemnification.**  Each Parcel owner shall indemnify, defend and save the other Parcel owners harmless from any and all liability, damage, demands, costs, expense, causes of action, suits, claims, or judgments arising from injury or death to persons and/or damage to property either (1) occurring on its own Parcel, except if caused by the act or neglect of another Parcel owner, or (2) arising out of or in connection with the performance of its obligations hereunder.

7.02  **Insurance.**  Each Parcel owner shall at all times maintain public liability insurance with limits of not less than $1,000,000 for injury to or death of any one person, $2,000,000 for injury to or death of more than one person in one occurrence and $500,000 with respect to damage to property.  Each such insurance policy shall name all other Parcel owners as additional insureds, shall specifically insure the performance by the party procuring the policy of its indemnity covenant contained in this Section 7 and shall contain a provision that the insurer shall give all insureds twenty (20) days advance written notice of any cancellation or lapse of coverage and the effective date of any reduction in the amount of or scope of coverage below that which is required by this Section 7.  Each Parcel owner shall deliver to the other owners proof of such insurance upon request.  Each Parcel owner shall

WBS14/m                                    -14-

86011737

promptly notify the other owners of any asserted claim with respect to which such Parcel owner is or may be indemnified against hereunder and shall deliver to such Parcel owners copies of process and pleadings. If any Parcel owner fails to obtain the insurance required by this Paragraph 7.02, the Maintenance Director shall obtain the appropriate insurance policy or policies on behalf of such Parcel owner, and such Parcel owner shall promptly reimburse the Maintenance Director for all premiums and other expenses paid by the Maintenance Director on account of obtaining such insurance.

8.    Eminent Domain.

8.01  Parcel Owner's Right to Award.  Nothing herein shall be construed to give any Parcel owner any interest in any award or payment made to any other Parcel owner in connection with any exercise of eminent domain or transfer in lieu thereof affecting another owner's Parcel or give the public or any government any rights in a Parcel. In the event of any exercise of eminent domain or transfer in lieu thereof of any part of the Common Areas, the award attributable to the land and improvements of such portion of the Common Areas shall be payable only to the owner of the portion of the Common Areas so taken, and no claim thereon shall be made by the owners of any other portion of the Common Areas.

8.02  Collateral Claims.  All Parcel owners may file collateral claims with the condemning authority for their losses which are separate and apart from the value of the land area and improvements taken from another Parcel owner.

8.03  Lessee's Claim.  Nothing in this Section 8 shall prevent a lessee from making a claim against a Parcel owner pursuant to the provisions of any lease between a lessee and an owner for all or a portion of any such award or payment.

9.    Agreement.

9.01  Modification - Cancellation.  Except as provided in Section 1, this Agreement may be modified or cancelled only by written consent of all the Parcel owners, which consent shall not be unreasonably withheld.  No such modification or cancellation will affect the rights of any mortgagee under a recorded first or second mortgage or the trustee or beneficiary under a recorded first or second deed of trust constituting a lien on any portion of the Shopping

WDS14/m                              -15-



Center at the time of such modification or cancellation unless such mortgagee or beneficiary and trustee shall consent in writing to such.

9.02 **Breach.** In addition to the remedies provided in Section 18 hereof, in the event of a breach or threatened breach of this Agreement, any Parcel owner shall be entitled to institute proceedings for full and adequate relief, including without limitation an action for equitable relief, from the consequences of such breach. The unsuccessful party in any action shall pay to the prevailing party a reasonable sum for attorneys' fees.

10. **Rights and Obligations of Lenders.** The charges and burdens of this Agreement are, and shall at all times be, prior and therefore superior to the lien or charge of any mortgage or deed of trust affecting any Parcel or any part thereof, or improvements now or hereafter placed thereon. However, a breach of any of the easements, or agreements hereof shall not defeat or render invalid the lien or charge of any mortgage or deed of trust.

11. **Rights of Successors.** The easements, restrictions, benefits and obligations hereunder shall create mutual covenants, benefits and servitudes upon all Parcels running with the land. This Agreement shall bind and inure to the benefit of, and be enforceable by and against, Declarant and its representatives, lessees, successors and/or assignees. The singular number includes the plural and each gender includes every other gender.

12. **Consents.** In any case where the consent of a lessee is required, such consent shall not be unreasonably withheld.

13. **Headings.** The headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Agreement nor in any way affect the terms and provisions hereof.

14. **Severability.** If any clause, sentence or other portion of this Agreement shall become illegal, null or void for any reason or shall be held by any court of competent jurisdiction to be so, the remaining portions thereof shall remain in full force and effect.

15. **Not a Public Dedication.** Nothing herein contained shall be deemed to be a gift or dedication of any portion of

WBS14/m                                    -16-



the Shopping Center to the general public or for the general
public or for any public purposes whatsoever, it being the
intention of Declarant that this Agreement shall be strictly
limited to and for the purposes herein expressed.

16.    Remedies.

16.01    General.  If any Parcel owner fails or
refuses at any time to pay when due its pro rata share of
the Common Area maintenance expenses for Parcels 1, 2, 3 or
4 as provided in Subparagraph 5.02.3 hereof or reimburse its
insurance expenses under Paragraph 7.02 hereof (a
"Defaulting Owner"), legal action may be instituted by the
Maintenance Director (or any Parcel owner) against the
Defaulting Owner to collect the amount owing plus interest
thereon at the rate of ten percent (10%) per annum from the
due date until paid and the amount of any costs and/or
attorneys' fees reasonably incurred in the action.
Furthermore, the Maintenance Director (or Parcel owner, as
the case may be) with a notification to the other Parcel
owners and Lessees shall have, and is hereby granted, a lien
on the Parcel of the Defaulting Owner for the amount of said
expenses, which amount shall bear interest at the rate of
ten percent (10%) per annum from the due date until paid.

16.02    Lien.  The lien provided for above shall
rank in priority from the date of recordation of a Claim of
Lien by the person claiming such in the Office of the
Recorder of the County of Sonoma, California.  The Claim of
Lien shall include the following:

16.02.1    Name.  The name of the lien
claimant;

16.02.2    Basis of Claim.  A statement
concerning the basis of the Claim of Lien and identifying
the lien claimant as either a Parcel owner or the
Maintenance Director;

16.02.3    Address.  The last known name and
address of the owner or reputed owner of the Parcel against
which the lien is claimed;

16.02.4    Description.  A description of the
property against which the lien is claimed;

16.02.5    Amount.  A statement of the amount
of the lien claimed; and

WBS14/m                        -17-



8E011737

16.02.6 <u>Authority</u>. A statement that the lien is claimed pursuant to the provisions of this Agreement reciting the date, book and page of recordation hereof.

The notice shall be verified and acknowledged and shall contain a certificate that a copy thereof has been served upon the owner against whom the lien is claimed either by personal service upon or by mailing (first class, certified, return receipt requested) to the Defaulting Owner at the address provided in the office of the Sonoma County Assessor for mailing of tax statements with respect to the property against which the lien is claimed. The lien so claimed may be foreclosed in any manner allowed by law for the foreclosure of liens.

IN WITNESS WHEREOF, Declarant has executed this Agreement as of the date first above written.

GREAT WESTERN OUTLET PARTNERS, a
California limited partnership

By:    GREAT WESTERN OUTLET COMPANY,
a California corporation,
General Partner

By: _____
David G. Nasaw
President

STATE OF CALIFORNIA
COUNTY OF San Francisco } SS.
On this 22nd day of January, in the year of
1990, before me, the undersigned, a Notary Public in
and for said County and State, personally appeared
David G. Nasaw, personally known
to me (or proved to me on the basis of satisfactory evidence) to be the
_____ President, and

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the President at
Secretary of Great Western Outlet Company
the corporation that executed the within instrument and known to me to
be the persons who executed the within instrument on behalf of said
corporation, said corporation being known to me to be one of the General
partners of Great Western Outlet Partners, the
partnership that executed the within instrument, and acknowledged to
me that such corporation executed the same to such partner and that
such partnership executed the same,

_____
Marilyn H. Noah
Name (Typed or Printed)
Notary Public in and for said County and State

[OFFICIAL SEAL
MARILYN H NOAH
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My comm. expires NOV 14, 1991]

FOR NOTARY SEAL OR STAMP

CHICAGO TITLE INSURANCE COMPANY
CORPORATION PARTNERSHIP

WBS14/m                          -18-





86011737

EXHIBIT B

All that certain real property situated in the
City of Santa Rosa, County of Sonoma, State of
California, described as follows:

LOT 2, as shown upon City of Santa Rosa Parcel
Map No. 400, filed September 20, 1984 in Book
361 of Maps, Pages 33 and 34, Sonoma County
Records.



**THELEN**
*Thelen Reid Brown Raysman & Steiner LLP*

225 West Santa Clara Street   Suite 1200   San Jose, CA 95113
Phone: 408 292 5800   Fax: 408 287 8040
www.thelen.com

Karin M. Frenza
408.282.3408 Direct Dial
408.278.8211 Direct Fax

Received

JUL 1 8 2008

SHOOK HARDY & BACON LLP

July 17, 2008

**VIA FEDERAL EXPRESS**
Alicia Donahue
Shook Hardy and Bacon
333 Bush Street, Suite 600
San Francisco, California U.S.A.
94104-2828

Re:   **Save Mart Supermarkets v. Wal-Mart Real Estate Business Trust
Case No: SOV 243210**

Dear Ms. Donahue:

Per your email to Dan Muller on July 15, 2008 regarding your authorization to accept service of the Complaint in the above entitled action on behalf of Wal-Mart Real Estate Business Trust, I enclose a copy of the Summons, Complaint and other documents provided by the Court. Also enclosed are two copies of the Notice of Acknowledgment of Receipt. Please sign and return one copy of the Notice of Acknowledgement in the self addressed stamped envelope within 20 days.

If you have any questions, please don't hesitate to call me at (408) 282-3408.

Sincerely,

*Karin Frenza*

Karin M. Frenza

Enclosures

SV #364777 v1

NEW YORK   SAN FRANCISCO   WASHINGTON, DC   LOS ANGELES   SHANGHAI   LONDON   SILICON VALLEY   HARTFORD   NORTHERN NJ



Insert
airbill
here

From: Origin ID: ZSNA   (408)292-5800
Daniel Muller
Thelen Reid Brown Raysman & Steiner
225 West Santa Clara St.
12th Floor
San Jose, CA 95113

SHIP TO: (415)544-1900                 BILL SENDER
Alicia J. Donahue, Esq.
Shook Hardy & Bacon LLP
333 Bush St
Ste 600
San Francisco, CA 941042828

FedEx Express

Ship Date: 17JUL08
ActWgt: 1 LB
System#: 7701970/WBUS0200
Account#: S ********

Delivery Address Bar Code

Ref #   816628.00001640553
Invoice #
PO #
Dept #

TRK#
0201   7984 8150 3278

WA APCA

FRI - 18 JUL
PRIORITY OVERNIGHT

A1

94104
CA-US
SFO

FOLD on this line and place in shipping pouch with bar code and delivery address visible
© 2005 FedEx 155470/155475 REV 8/06 RI